# United States Court of Appeals
## For the First Circuit

No. 17-1364

UNITED STATES,

Appellee,

v.

JUAN JOSE TULL-ABREU,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Guillermo A. Macari-Grillo for appellant.
Andrew W. Laing, Criminal Division, Appellate Section, with
whom Rosa E. Rodríguez-Vélez, United States Attorney, Brian A.
Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy
Assistant Attorney General, and Dennise N. Longo Quiñones,
Assistant United States Attorney, were on brief, for appellee.

April 19, 2019

**LYNCH**, **Circuit Judge**.  After a fourteen-day jury trial, Dr. Juan Jose Tull-Abreu was convicted of one count of conspiracy to commit health care fraud, eight counts of health care fraud, six counts of aggravated identity theft, and four counts of furnishing false or fraudulent information in prescriptions for controlled substances.  Tull-Abreu's scheme went on for about four years and he profited by over $500,000 from his defrauding of the federal Medicare program and Medicare insurance plans.  He was sentenced to a total of eighty-seven months' imprisonment.

On appeal, Tull-Abreu's counselled brief challenges the sufficiency of the evidence underlying his convictions for aggravated identity theft, the denial of his motion for a new trial (concerning an alleged violation of his right to testify), the denial of his motion for a judgment of acquittal as to furnishing false or fraudulent information in prescriptions, and the substantive reasonableness of his sentence.  In a pro se brief, Tull-Abreu challenges the sufficiency of the evidence for his conspiracy and health care fraud convictions and argues that an aspect of the trial violated his Sixth Amendment rights.

We affirm.

I.

A.  Factual Background

Because Tull-Abreu challenges the sufficiency of the evidence for his convictions, these "facts are drawn from the

record created at trial and are presented in the light most favorable to the guilty verdict." United States v. Monserrate-Valentín, 729 F.3d 31, 37 (1st Cir. 2013). Additional facts are discussed in the analysis where relevant, and we state only the facts pertinent to this appeal.

From 2009, Tull-Abreu, a medical doctor, operated two medical offices in Puerto Rico, one in Arecibo and one in Utuado, and employed staff including secretaries. Three secretaries testified at trial. One had worked for Tull-Abreu from April 2009 to July 2014 (with a two-week break in early 2013), one from 2011 to 2013, and one from February to September 2013. Between 2009 and 2013, Tull-Abreu regularly traveled to the Dominican Republic, sometimes several times per month.

From 2009 to 2013, Tull-Abreu and his secretaries asked for and received patients' signatures on extra Medicare reimbursement forms which had certain information missing, such as the date of service, and Tull-Abreu and his secretaries submitted these forms to obtain payment. The form was the "Health Insurance Claim Form" ("CMS 1500 form"), a standard form for Medicare billing and reimbursement. See United States v. López-Díaz, 794 F.3d 106, 109 (1st Cir. 2015). The CMS 1500 form has six spaces for "Date(s) of Service" and, corresponding to these dates, spaces for "Procedures, Services, or Supplies."

Tull-Abreu and his secretaries obtained signatures from patients on these often-undated CMS 1500 forms by falsely telling patients, for example, that "one form was for the visit, and the other was for the [prescription]" or that one "form is for the prescription, [and the other one] is for the referral." Tull-Abreu and his secretaries took these forms and fabricated corresponding "progress notes" for patients, which included dates of fictitious appointments and services.

Tull-Abreu was caught on an audio recording instructing his secretaries how to fill out these forms for services that were not rendered, and he and they filled out such forms. There is no evidence that Tull-Abreu forced his staff to do this, and one of his secretaries worked for him for nearly the full four years of the scheme. Tull-Abreu and his staff then submitted these fraudulent forms for reimbursement from Medicare plans, including for visits and services that did not and could not have occurred because Tull-Abreu's pertinent medical office was closed or he was in the Dominican Republic on the dates that the visits purportedly took place. The submitted CMS 1500 forms contained identifying information of the patients and had their signatures in a box on the form that stated the patients' agreement to "authorize payment of medical benefits to the undersigned physician or supplier for services described below."

Tull-Abreu took steps to hide the fraud: His staff kept records, in internal "roll books," of dates that they had used earlier on fraudulent CMS 1500 forms, "to avoid repeating dates." This helped to avoid alerting insurers, who provided reimbursement through the Medicare plans, of the fraud. Tull-Abreu kept a supply of undated but patient-signed CMS 1500 forms.

From 2011 to 2013, Tull-Abreu also wrote prescriptions for Percocet. Because Percocet was, and is, a controlled substance, see United States v. Alvarez-Núñez, 828 F.3d 52, 54 (1st Cir. 2016), such prescriptions must be dated and signed on the day that they are issued, see 21 C.F.R. § 1306.05(a). Tull-Abreu did not do that; he wrote in dates when he was in fact out of the country or traveling. The government put in evidence of four such falsely-dated prescriptions. Tull-Abreu's patients and staff testified that Tull-Abreu would leave postdated prescriptions before his trips, to be given to patients while he was gone.

B.    Procedural History

Tull-Abreu was indicted on August 12, 2014, by a grand jury on one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; eight counts of health care fraud, in violation of 18 U.S.C. § 1347; six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); and four counts of furnishing false information in prescriptions for controlled

- 5 -

substances, in violation of 21 U.S.C. § 843(a)(4)(A). The conspiracy charge outlined an agreement between Tull-Abreu and unnamed others to "unlawfully enrich [Tull-Abreu] by submitting false and fraudulent claims to Medicare." The fraud charges set forth Tull-Abreu's particular claims for reimbursement for eight patient office visits that never occurred. The aggravated identity theft charges set forth six uses of different patients' identifying information on fraudulent CMS 1500 forms. The furnishing false information charges concerned four Percocet prescriptions bearing dates and signatures for dates on which they had not been signed.

Tull-Abreu's jury trial began on March 29, 2016. On the thirteenth day of trial, Tull-Abreu was set to testify. Before he took the stand, the prosecutor asked that Tull-Abreu be advised of his rights regarding testifying on his own behalf. With no objection from Tull-Abreu's counsel, the district court then explained, out of the presence of the jury, to Tull-Abreu his constitutional right not to testify and the legal ramifications of a choice to testify. The court then recessed so that Tull-Abreu and his counsel could confer. They did so for about half an hour. His counsel then informed the court that Tull-Abreu had decided not to testify, counsel again made no objection to the actions of the prosecution or the district court, and the defense rested. Later, the district court instructed the jury that Tull-Abreu was

"entitled to the presumption of innocence" and so "his silence is not to be taken against him."

Tull-Abreu was convicted of all counts on April 15, 2016. On May 27, 2016, he moved for a judgment of acquittal and for a new trial under Federal Rules of Criminal Procedure 29 and 33, respectively. In his Rule 29 motion, he alleged that insufficient evidence supported all convictions (except conspiracy). In his Rule 33 motion, he argued, among other things, that he had received an unfair trial due to the prosecutor's request that the district court remind Tull-Abreu of his constitutional right not to testify and the legal ramifications of choosing to testify. On August 23, 2016, the district court denied Tull-Abreu's motions for a judgment of acquittal and for a new trial.

The district court sentenced Tull-Abreu to eighty-seven months' imprisonment and three years' supervised release. The court calculated a sixty-three month sentence, at the bottom of the Sentencing Guidelines' range of sixty-three to seventy-eight months' imprisonment for all counts except the aggravated identity theft counts, and added the consecutive mandatory fixed term of twenty-four months for the violations of the aggravated identity theft statute.

II.

We deal with the primary issues raised by Tull-Abreu's counselled brief and at oral argument, then the subsidiary issues, then the issues raised pro se.

A.   Challenge to Convictions for Aggravated Identity Theft

Under the relevant part of the aggravated identity theft statute,

> [w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1).  Felonies enumerated in subsection (c) include "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)," id. § 1028A(c)(5), which in turn includes both health care fraud and conspiracy to commit health care fraud, see id. §§ 1347, 1349.

Tull-Abreu mistakenly argues in his brief that his convictions for aggravated identity theft rested on his writing four postdated prescriptions for Percocet.  Yet his aggravated identity theft convictions are not based on these postdated prescriptions but on his submission of the fraudulent CMS 1500 forms.  Each count of aggravated identify theft in the indictment is tied to a patient whose identifying information was listed on

a particular submitted CMS 1500 form; the relevant aggravated identity theft portion of the indictment does not mention the Percocet prescriptions.  The evidence at trial followed suit.

Nonetheless, we will assume arguendo -- and in Tull-Abreu's favor -- that Tull-Abreu's challenge to the aggravated identity theft convictions has not been waived[1] and that his argument is that the submission of the fraudulent CMS 1500 forms did not satisfy the "use" requirement of the statute.[2]  The argument still fails.

The government argues that Tull-Abreu "purport[ed] to take some other action on another person's behalf," as described in United States v. Berroa, 856 F.3d 141, 156 (1st Cir. 2017), cert. denied sub nom. Davila v. United States, 138 S. Ct. 488 (2017) (mem.).  We agree.

This court defined the scope of the "use" term of § 1028A in Berroa.  We held that the "use" term was ambiguous, and the statute's legislative history demonstrated that the term "require[d] that the defendant attempt to pass him or herself off

---

[1]     The government does not expressly argue waiver, though they do note Tull-Abreu's misunderstanding of the basis for these charges.

[2]     It is clear, and Tull-Abreu does not suggest otherwise, that: (1) the government amply demonstrated at trial that the filing of the forms was "in relation to any [enumerated] felony," health care fraud; and (2) the government demonstrated that the use of patients' information was "without lawful authority" based on testimony from a patient, see 18 U.S.C. § 1028A(a)(1).

as another person or purport to take some other action on another person's behalf."[3]  Id.

By filing each of the fraudulent CMS 1500 forms for which he was charged, Tull-Abreu "purport[ed] to take some other action on another person's behalf," as set forth in Berroa.  The CMS 1500 forms require "the identifying information of the patient[s], their name[s], date[s] of birth, [and] their Medicare ID number[s]."  Each count of aggravated identity theft was connected to a particular actual patient at trial.  One of the patients testified that he would "[n]ever" have authorized Tull-Abreu to invoice services that were not provided.  The signature and date on the authorization box meant that patients were "reassigning their benefit payments of the claim directly to the doctor, so that [the patients] don't have to be involved."  Tull-Abreu "use[d]" patients' "means of identification," 18 U.S.C. § 1028A(a)(1), and assigned benefits to himself when he submitted the fraudulent forms.

---

[3]    In accord with Berroa, "[n]umerous . . . decisions have upheld § 1028A(a)(1) convictions where the defendant neither stole nor assumed the identity of the other person."  United States v. Gatwas, 910 F.3d 362, 365 (8th Cir. 2018); see also United States v. White, 846 F.3d 170, 177 (6th Cir. 2017) (affirming a conviction where defendant submitted to airlines "what she represented to be actual identification that the United States Military purportedly had issued for her clients"); United States v. Reynolds, 710 F.3d 434, 435-36 (D.C. Cir. 2013) (affirming a conviction where the defendant submitted a document to a bank bearing the signatures of other persons without their permission).

Two cases from the Sixth Circuit, which we cited approvingly in Berroa, and which Tull-Abreu cites in his counselled brief, do not support his argument. In United States v. Miller, 734 F.3d 530 (6th Cir. 2013), the court held that the term "use" in § 1028A was ambiguous, and required a defendant to "steal or possess [others'] identities, impersonate them or pass himself off as one of them, act on their behalf, or obtain anything of value in one of their names." Id. at 541 (footnote omitted). Under this definition, Tull-Abreu "use[d]" others' identifying information and acted on their behalf.

In United States v. Medlock, 792 F.3d 700 (6th Cir. 2015), the Sixth Circuit rejected the government's contention that the defendants had "'used' the name and Medicare Identification Numbers of Medicare beneficiaries" when the defendants submitted claims that contained some false information (chiefly that some beneficiaries had been transported by stretcher when they had been transported by other means, such as wheelchair). Id. at 705-06. The defendants "did transport the specific beneficiaries whose names they entered on the forms; they lied only about their own eligibility for reimbursement for the service." Id. at 706. The Sixth Circuit distinguished Medlock from a case concerning "claim forms for trips that did not, in fact, occur." Id. at 707 (quoting United States v. Abdelshafi, 592 F.3d 602, 605 (4th Cir. 2010)). Tull-Abreu did not provide the listed medical services to the

- 11 -

patients whose information was used on the fraudulent forms, falling within the distinction drawn.

The more recent United States v. Michael, 882 F.3d 624 (6th Cir. 2018), also supports affirming Tull-Abreu's conviction. There, the Sixth Circuit reversed the dismissal of an indictment under § 1028A where the defendant, a pharmacist, used a doctor's and a patient's identifying information to create a false prescription and so gain reimbursement for that prescription. Id. at 625-27. The court determined that a jury could find that the defendant "used" the doctor's and the patient's identifying information "even though [the defendant] did not pretend to be them." Id. at 626 (emphasis omitted). The court held that "[a] jury readily could find that a pharmacist who files a claim with a patient's insurer to recoup costs the patient would otherwise have to pay refer[s] to means of identification as such and acts on [that patient's] behalf." Id. at 628 (alterations in original) (internal quotation marks omitted).

Tull-Abreu's conduct as to the CMS 1500 forms fits easily into "use" under the Berroa test.

B.   Denial of Motion for a New Trial

Tull-Abreu's counselled brief challenges the denial of his motion for a new trial under Rule 33, arguing loosely that "intimidat[ion]" by the district court and the prosecutor "violated" Tull-Abreu's "rights to a [f]air [t]rial and to present

- 12 -

a complete defense," though he and his counsel made no objection at the time.[4]

We review the denial of a Rule 33 motion for "manifest abuse of discretion," United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001), with the "respect . . . due to the 'presider's sense of the ebb and flow of the recently concluded trial,'" United States v. Connolly, 504 F.3d 206, 211 (1st Cir. 2007) (quoting United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991)).

We first provide additional context for our fact-bound inquiry. Just after Tull-Abreu's counsel called for him to take the witness stand, the prosecutor asked to approach the bench and stated:

> I just want to make it clear, to avoid any issues on appeal, that the defendant has been duly given an opportunity to make a waiver of his rights. So I would appreciate that . . . we take an opportunity to advise him on the record so that he makes an informed,

---

[4]     Tull-Abreu's counselled brief also argues, in passing, that "the [district court] denied Rule 403 objections from the defense on three occasions," and that these rulings in part led to a constitutional violation. Tull-Abreu does not otherwise challenge the Rule 403 rulings, nor provide a basis for why these evidentiary rulings constituted a constitutional violation. Further, Tull-Abreu does not explain what specifically was wrong with these evidentiary rulings (nor even state what the rulings were, beyond citations to pages in the trial transcripts).

Accordingly, this argument is waived. It is "mention[ed]" in "the most skeletal way," and so would "leav[e] the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 13 -

> knowledgeable and voluntary waiver of his
> right not to testify . . . .

(Emphasis added). When defense counsel did not object, the district judge agreed that this "might be a good idea," and then excused the jury. On the record but out of the presence of the jury, the judge told Tull-Abreu that Tull-Abreu "doesn't have to testify at all . . . . It's a constitutional right," and that, if Tull-Abreu chose not to testify, the judge would give a jury instruction that "they are not to be taking that silence against him."

After a request from the prosecutor for further clarification (again, not objected to), the district judge then told Tull-Abreu that if Tull-Abreu testified, "there is not going to be any instruction to the jury concerning the right . . . to remain silent." Tull-Abreu then asked to consult with his lawyer, and the district judge told Tull-Abreu, "If you want to consult with your counsel, he's right here, yeah." The prosecutor then asked that the district judge explain to Tull-Abreu that "the government will be able to comment . . . on everything that has to do with his statements," and the district judge agreed and briefly told Tull-Abreu about the possibility of cross-examination and impeachment with respect to documents in evidence.

The court then recessed for about thirty minutes for Tull-Abreu to consider the matter with his counsel and "make a

- 14 -

very intelligent and well-oriented decision." After returning to the courtroom, Tull-Abreu's counsel informed the judge at sidebar that Tull-Abreu had decided not to testify.[5] The defense then rested, making no mention to the jury of Tull-Abreu's decision not to testify.

While it may or may not have been unusual (we are given no information) for the prosecutor to raise the topic of the defendant being fully advised of his Fifth Amendment right not to testify and the possible consequences of his taking the stand, our review of the record shows no improprieties and certainly no infringement of Tull-Abreu's rights. Though a district judge generally is under "no duty to apprise a criminal defendant of the right to testify or to secure an explicit waiver of that right," United States v. Padilla-Galarza, 886 F.3d 1, 9 (1st Cir. 2018), it is not uncommon for district judges to make sure defendants and witnesses are fully apprised of their testimonial rights, see,

---

[5] Tull-Abreu's counsel stated at sidebar, in part: "What I want to say on the record is, that following the Court's opportunity that we discuss with our client, we have discussed it with our client, and he has decided to exercise his constitutional [sic] -- not . . . to testify."

Tull-Abreu's affidavit submitted with his motion for a new trial makes the claim that the prosecutor somehow intimidated him into not testifying by raising the issue of his Fifth Amendment rights. We reject his assertion for a number of reasons, including that: he was advised by his own counsel after the prosecutor raised the issue, and his counsel disclosed to the court that Tull-Abreu had decided not to testify. At no time during this period did Tull-Abreu or his counsel suggest that Tull-Abreu's decision was involuntary.

e.g., United States v. Santiago-Becerril, 130 F.3d 11, 26 (1st Cir. 1997) ("A judge is entitled to make sure a witness understands her Fifth Amendment rights."); Berkovitz v. Minnesota, 505 F.3d 827, 828 (8th Cir. 2007) ("The trial court, on the record, made sure that [the defendant] understood that she had both the right to testify and the right to remain silent."); United States v. Webber, 208 F.3d 545, 552 (6th Cir. 2000) (affirming the district court's "non-coercive explanation of the law" to the defendant about the defendant's right to testify or remain silent and possible consequences if the defendant chose to testify).

There is no claim that there was anything wrong in the district court's explanation of the law, and indeed the explanation was accurate as to the right not to testify and some potential consequences of choosing to testify (for example, possibly facing cross-examination). Tull-Abreu had counsel at his side throughout these exchanges, and his counsel did not object or in any manner suggest that it was inappropriate for the government to raise the issue; to the contrary, Tull-Abreu's counsel asked that the prosecutor "finish" her explanation. And Tull-Abreu and his counsel were granted a recess to contemplate the matter further and did not ask for more time after the recess.

Further, the district judge instructed the jury after the defense rested that Tull-Abreu was "entitled to the presumption of innocence" and so "his silence is not to be taken against him."

- 16 -

The following day, the district judge instructed the jury similarly, with a reminder that "no inference of guilt, or of anything else, may be drawn from the fact that [Tull-Abreu] did not testify."

In the end, Tull-Abreu's argument rests on the assertions that the prosecutor should not have raised the issue (done to ensure against issues on appeal), the district court should not have explained Tull-Abreu's rights, and the raising and explaining of Tull-Abreu's rights essentially coerced or intimidated Tull-Abreu into not testifying.  But on this record, accurately making sure a defendant is fully apprised of his rights is not coercion or any such violation.  Accord United States v. Joelson, 7 F.3d 174, 178 (9th Cir. 1993).  Further, Tull-Abreu does not show prejudice, either, given the substantial amount of evidence presented against him.  See United States v. Rodríguez-Vélez, 597 F.3d 32, 45 (1st Cir. 2010) (noting that, when considering potential harm from a Fifth Amendment violation about the right to remain silent, "[l]ast -- but far from least -- this was not a close case").

C.   Denial of Motion for a Judgment of Acquittal

We turn to Tull-Abreu's contention that the district court incorrectly denied his third motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, as to the charges of furnishing false or fraudulent information for

prescriptions in controlled substances.  We review the denial of a Rule 29 motion for a judgment of acquittal de novo, United States v. Acevedo, 882 F.3d 251, 258 (1st Cir. 2018), but that review is "quite limited" and "we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt," United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000) (quoting United States v. Paradis, 802 F.2d 553, 559 (1st Cir. 1986)).

Tull-Abreu, in his counselled brief, argues that the evidence was insufficient for the four counts of furnishing false or fraudulent information in prescriptions for Percocet[6] because the prescriptions could have been written "before he went to the airport" on days when he was traveling, or could have been sent

---

[6]    The relevant statute states in part:

> It shall be unlawful for any person knowingly or intentionally -- . . .
> (4)(A)  to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II[.]

21 U.S.C. § 843(a)(4)(A).  A federal regulation concerning the "[m]anner of issuance of prescriptions" mandates in part that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued."  21 C.F.R. § 1306.05(a).

"to the pharmacy by electronic transmission or fax" while he was traveling out of the country.  Not so.

As to Tull-Abreu's airport theory (that he could have been in one of his medical offices on a day he traveled to or from the Dominican Republic), three of the four prescriptions at issue had dates that were in the middle of trips Tull-Abreu took to the Dominican Republic, not dates on which he traveled to or from Puerto Rico.  Only the December 12, 2012, prescription corresponded to a day when he could have returned to Puerto Rico.  But his secretaries testified that Tull-Abreu "would not come over to the office" on days he traveled to and from the Dominican Republic, and that he would "leave [prescriptions] ready" (that is, dated and signed) in advance of his trips, sometimes for his secretaries to deliver after he had left and before he returned.  One secretary explained that Tull-Abreu "would leave [the prescriptions] prepared and ready.  And then, on the date that the prescription was due, the patient would . . . be told to come over to pick up the prescription . . . ."  A patient also testified that "if [Tull-Abreu] had a trip, he would leave [a prescription] ready."  As to the electronic transmission theory, there was no evidence at trial supporting it and it is contrary to the evidence just recited.

D.   Substantive Reasonableness of the Sentence Imposed

Tull-Abreu's counselled brief challenges the substantive reasonableness of his sentence, conceding the procedural

reasonableness. Tull-Abreu's argument here is premised entirely on his contentions that: (1) the convictions should be vacated, and indictments should be dismissed, for aggravated identity theft; (2) the convictions should be vacated, and the indictments should be dismissed, for providing false and fraudulent information for the Percocet prescriptions; and (3) Tull-Abreu's Sixth Amendment rights were violated because he could not present a complete defense. We have rejected each of these contentions, and his bottom-of-the-Guidelines-range sentence is not outside the "universe of reasonable sentences," <u>United States</u> v. <u>Rivera-González</u>, 776 F.3d 45, 52 (1st Cir. 2015). That ends the matter.

E. <u>Pro Se Arguments</u>

Tull-Abreu's pro se brief raises sufficiency challenges to his conspiracy conviction and his health care fraud convictions and argues that his rights under the Confrontation Clause were violated.

1. <u>Sufficiency of the Evidence for Conspiracy to Commit Health Care Fraud</u>

Tull-Abreu argues pro se, and for the first time on appeal, that his conviction for conspiracy to commit health care fraud was not supported by sufficient evidence. This is because, he argues, his secretaries who testified at trial did not say "whether they agreed to participate in the alleged fraud." No such testimony was needed for two reasons. First, such an

- 20 -

agreement can "be proven solely by circumstantial evidence," United States v. Iwuala, 789 F.3d 1, 9 (1st Cir. 2015), and second, an agreement can "be inferred from other evidence including a course of conduct," United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993).

The jury could easily have inferred that Tull-Abreu had an agreement, explicit or implicit, with his secretaries to take part in the fraudulent scheme. Our recitation of the evidence explains the key roles, over time, that the secretaries played in the fraud. The government offered an audio recording of Tull-Abreu explaining to two of his secretaries how they should fill out CMS 1500 forms for services that had not been provided to patients, including explaining why some of the CMS 1500 forms and supporting progress notes were left undated (in Tull-Abreu's own words, "[s]o we can put the dates on"). The audio recording has no statements of protest from the secretaries, and inference of agreement could be drawn from this recording alone. Three secretaries testified, covering all four years of the fraudulent scheme. Indeed, one secretary who worked with Tull-Abreu from 2009 to 2014 explained that she knew that "only one form per visit" should be collected from a patient, rather than the multiple forms that were often collected as part of the fraud.

The overall "course of conduct," id., readily supports an inference of conspiracy. No more is needed.

2.   Sufficiency of the Evidence for Health Care Fraud

Tull-Abreu argues in his pro se brief that insufficient evidence supported his health care fraud convictions, on the theory that, had he falsely billed for every patient, every visit, every week, the proceeds from the fraudulent scheme would have been far greater than the amount stated in the government's restitution request and the subsequent restitution order.[7]

To start, the government's case was not that every patient of Tull-Abreu's was part of the fraudulent scheme; Tull-Abreu was more selective.  Further, the amount of restitution is not relevant to the sufficiency of the evidence supporting Tull-Abreu's convictions for health care fraud.  Restitution is part of a criminal penalty.  See, e.g., United States v. Ziskind, 471 F.3d 266, 270 (1st Cir. 2006).  Indeed, restitution can be based in part on acquitted conduct, as it requires "the less stringent preponderance of the evidence standard."  United States v. Pena, 910 F.3d 591, 604 (1st Cir. 2018).

3.   Right to Challenge Particular Non-Witnesses

In his pro se brief, Tull-Abreu argues that he was denied his Sixth Amendment right to be confronted with the witnesses against him.  Tull-Abreu argues that the Confrontation Clause meant

---

[7]     Tull-Abreu incorrectly states several times in his pro se brief that the restitution amount was $1.2 million; the actual amount imposed was $518,775.20.

- 22 -

that the government was required to call five of his patients whose information was used on fraudulent CMS 1500 forms.  The argument is subject to plain error review,[8] as it was not raised before the district court, see United States v. Acevedo-Maldonado, 696 F.3d 150, 156 (1st Cir. 2012), and is without any merit.

It is axiomatic that "[t]he confrontation clause does not come into play where a potential witness neither testifies nor provides evidence at trial."  United States v. Porter, 764 F.2d 1, 9 (1st Cir. 1985); see also Michigan v. Bryant, 562 U.S. 344, 354 (2011) (noting the "limit[ing of] the Confrontation Clause's reach to testimonial statements"); Crawford v. Washington, 541 U.S. 36, 51 (2004) (noting that the Confrontation Clause "applies to witnesses against the accused -- in other words, those who bear testimony" (internal quotation marks omitted)).  None of the five former patients that Tull-Abreu points to were called as witnesses by the prosecution or provided evidence at trial.  Tull-Abreu was free to call them but chose not to do so.  His Sixth Amendment rights were not violated.

---

[8]     Plain error requires a showing of "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'"  Johnson v. United States, 520 U.S. 461, 467 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).  If those three conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"  Id. (some internal quotation marks omitted) (quoting Olano, 507 U.S. at 732).

III.

<u>Affirmed</u>.