[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12287

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MICHAEL YLINIEMI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:19-cr-00083-TKW-MJF-1

_____

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

A jury convicted Michael Yliniemi of receiving and possessing child pornography. On appeal, Yliniemi challenges his conviction, arguing that the district court pressured him to testify and so his decision to take the stand was not knowing, intelligent, and voluntary. We affirm Yliniemi's conviction but remand for the district court to correct a clerical error in the judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A grand jury indicted Yliniemi on two counts: (1) receiving child pornography, in violation of 18 U.S.C. sections 2252A(a)(2) and (b)(1); and (2) possessing child pornography involving a prepubescent minor and a minor under the age of twelve, in violation of 18 U.S.C. sections 2252A(a)(5)(B) and (b)(2). Yliniemi pleaded not guilty and the case was set for trial.

At trial, the district court spoke with the parties before jury selection, and it noted that Yliniemi's witness list didn't list anyone "other than the defendant." Yliniemi's lawyer told the district court that "[w]e haven't made a final decision on whether to put [Yliniemi] on the stand yet." The district court said that it understood and that Yliniemi wouldn't need to make a final decision until after the government's case—which, if things went "smoothly," would be later that day.

After the parties selected a jury and gave their opening statements, the government presented its four witnesses. First, the government called Aubrey Chance, an investigator with Bay County Sheriff's Office, who testified to the following. In December 2018, the National Center for Missing and Exploited Children referred sixteen cases to the sheriff's office involving a Facebook account with the name "Ryan Madnes." The Madnes account led a chatroom that the National Center for Missing and Exploited Children flagged for child pornography.

Investigator Chance executed two search warrants: one on Facebook for records related to the Madnes account and one on a phone provider for a phone number linked to that Facebook account. The Facebook search revealed that the Madnes account user had shared about 180 images and 109 videos of child pornography. Some of those images and videos showed minors under the age of twelve engaged in sexual acts. The Madnes account was linked to the email address "boywanker1095," and its user claimed to be a young boy depicted naked in an image that he would send to others.

The search directed to the Madnes account's phone number uncovered evidence linking Yliniemi to the number. The search revealed that the phone number: belonged to the same user since 2017; placed more than forty percent of its calls to someone Yliniemi had lived with at the time; and was used most frequently at Yliniemi's home and work addresses. Investigator Chance also looked to see whether the phone number had ever called 9-1-1. As

it turned out, someone had made a 9-1-1 call from the number, identified himself as "Michael" (Yliniemi's first name), and reported a trespass at his address (Yliniemi's address). Investigator Chance testified that "everything . . . start[ed] coming together at that point."

So Investigator Chance questioned Yliniemi where he worked—a Waffle House in Panama City Beach. Yliniemi at first denied using the phone number but then admitted that he had used the number since 2017. Yliniemi also said that he didn't know anything about the Madnes account before admitting that the account was his.

At that point, Investigator Chance read Yliniemi his *Miranda*[1] rights and took him to the sheriff's office, where he recorded the rest of Yliniemi's interview. During this interview, which the government played for the jury, Yliniemi said that he created the Madnes account on "[his] phone." He admitted that he got involved in a chat room where he and others exchanged child pornography.

The next three witnesses offered similar testimony. The second witness, Lindsey Miller, was a crime analyst at the Bay County Sheriff's Office. Miller testified about the call to 9-1-1 and explained that she analyzed Madnes's phone number and found that the most common call was to someone Yliniemi had been living with at the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

time. The third witness, David Ammons, was Yliniemi's boss at Waffle House. Ammons testified that he had used the phone number associated with Madnes to call Yliniemi. The fourth (and final) government witness was Yliniemi's ex-girlfriend, Amanda Thorburn. Thorburn testified that Yliniemi called her from jail and "confessed to [her] on the phone," telling her that he "looked up things he shouldn't have." The government rested.

After the government rested, the district court asked Yliniemi (out of the jury's presence) if he "plan[ned] to put on a case." Yliniemi's lawyer responded: "He has spoken to me, and I've spoken to him at length about this particular issue. He's choosing not to testify."

At that point, the district court addressed Yliniemi personally and let him know that he had both "an absolute right not to testify" and "an absolute right to testify." The district court swore Yliniemi in and asked him if he understood his "right to either testify or not testify." Yliniemi responded, "Yes, sir." "And you understand," the district court asked, "that that's a decision that only you can make?" While Yliniemi confirmed that he understood, Yliniemi's lawyer interjected and told the district court that Yliniemi was "torn between testifying and not testifying."

Yliniemi then asked for more time to think about testifying, and he stated that he wanted "to spend one more night with [his] family" because his father was older and had heart problems. The district court asked how much time had passed since his arrest, and Yliniemi said that he had been busy with work. Yliniemi also stated

that he hadn't "had very much time" with his attorney to discuss whether to testify.

The district court then asked Yliniemi if he would be able to decide if it gave him more time to speak with his lawyer. Yliniemi responded: "I'd like to spen[d] my last night with my parents, if this is my last night." The district court then asked, "[y]ou under-stand you're not going to be shot at the end of this, don't you," and explained that Yliniemi hadn't suggested that spending more time with his family would impact his decision to testify.

The district court explained to Yliniemi that, if he decided not to testify, the jury wouldn't be allowed to hold that decision against him. The district court also explained that the jury would "weigh [his] testimony like any other witness." The district court then asked Yliniemi about his prior criminal history and whether he'd taken his lack of a criminal history into account in deciding whether to testify. Yliniemi responded, "I need time with [counsel] and I'll testify."

The district court decided to take a fifteen-minute break so that Yliniemi could discuss his decision with his lawyer. The dis-trict court also repeatedly explained that it was "not trying to influ-ence [Yliniemi] one way or the other," that the decision was one that "only" Yliniemi could make, that it was "completely [Yliniemi's] decision," and that Yliniemi's decision wouldn't "mat-ter one way or the other" to the district court. Yliniemi told the district court that he understood, and then they broke.

20-12287                Opinion of the Court                7

The parties returned almost twenty minutes later. The district court then had an exchange with Yliniemi, in which Yliniemi confirmed that he had enough time to talk to his lawyer, that he understood his rights, and that he had chosen to take the stand:

> THE COURT: All right. Mr. Yliniemi, when we left you asked for some additional time to discuss with [your lawyer]. Have you had the time you need to discuss with him?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And have the time to discuss what options you have in this case about testifying?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And have you made a decision at this point what you intend to do?
>
> THE DEFENDANT: We're going to testify.
>
> THE COURT: You're going to testify. All right. You understand that decision is a decision that only you can make?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And whatever advice [your lawyer] gave you is something you can take into account or not take into account . . . but you ultimately have to make that final decision?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you said you do not have a criminal history?

THE DEFENDANT:  No, I don't have a criminal history, sir.

THE COURT:  Okay.  And you do understand . . . if you had chosen not to testify, I would tell the jury they can't hold that against you in any way, shape, or form?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  And even knowing that, you want to get on the stand and testify?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand, when [you do] that, you're going to be subject to cross-examination by [the government]?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand that when you get on the stand and testify, the jury's going to weigh your testimony just like any other witness?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand that, . . . if you say anything untrue on the stand, you could be

subject to a perjury prosecution, separate and apart
from this case?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Knowing all that, your de-
cision is still to testify?

THE DEFENDANT:  Yes, sir.

With that, Yliniemi took the stand.  Yliniemi denied receiv-
ing or possessing child pornography.  He testified that he gave the
taped confession because Investigator Chance told him he would
not go to jail if he confessed.  Yliniemi also testified that he told his
ex-girlfriend that he was accused of accessing child pornography,
not that he in fact did so.

The jury found Yliniemi guilty of both counts.  The district
court sentenced him to 168 months' imprisonment to be followed
by five years of supervised release.  Yliniemi timely appealed.

## DISCUSSION

### The right to testify or to remain silent

Yliniemi argues that his conviction must be reversed be-
cause his decision to testify was not "knowing, intelligent, and vol-
untary."  He contends that the district court created a "coercive

atmosphere" by questioning him and then requiring him to make a quick decision. We disagree.[2]

"A criminal defendant has a constitutional right to choose whether or not to testify[.]" *United States v. Anderson*, 1 F.4th 1244, 1253 (11th Cir. 2021); *see also Rock v. Arkansas*, 483 U.S. 44, 52–53 (1987) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." (cleaned up)). "This right [to testify or to remain silent] is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc). It's the defendant's choice alone. *Id.*

We've explored how a district court might probe a defendant's decision. On the one hand, the district court is generally not required to "conduct an on-the-record inquiry" into whether the defendant has "knowingly, voluntarily, and intelligently waived" his right to testify or to remain silent. *United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998); *see also Anderson*, 1 F.4th at 1259 (same). In fact, a "district court runs the risk of

---

[2] The parties disagree about whether we should review for plain error or structural error. Because we find no error at all, we don't need to reach that issue. *See United States v. Nelson*, 884 F.3d 1103, 1104 (11th Cir. 2018) ("[W]e are presented with several questions about the nature of and relationship among the various 'error' doctrines that pervade federal criminal law—trial error, harmless error, structural error, plain error, and invited error. In the end, we needn't definitively resolve those questions, because . . . the district court committed no constitutional error.").

denying a defendant's right to testify [or to remain silent] by engaging in too searching of an inquiry; its questions might dampen the defendant's protected choice." *United States v. Hung Thien Ly*, 646 F.3d 1307, 1318 (11th Cir. 2011).

On the other hand, there is certainly no per se rule prohibiting a trial court from ensuring that a defendant's choice is knowing, intelligent, and voluntary. "[A] trial court's inquiry as to whether a defendant wishes to testify or to remain silent is hardly an act that deprives the defendant of his right to choose." *Anderson*, 1 F.4th at 1253. Indeed, on-the-record questioning is often a "pruden[t]" means of protecting a defendant's right to testify. *Id.* at 1257–59. A simple colloquy can "nip . . . post-conviction issues in the bud, eliminating the basis for a claim that the defendant was denied the right to testify [or to remain silent]." *Id.* at 1258. Asking whether the defendant freely decided also "ensures that the defendant's rights are protected." *Id.* at 1259.

In the end, a "district court's straightforward and neutral inquiry" won't violate a defendant's right to make a personal choice as to whether to testify. *Id.* at 1253. In conducting this inquiry, however, the district court must "avoid questions that probe trial-strategy issues or suggest the court's own opinion as to what choice the defendant should make—questions that might disturb the attorney-client relationship, undermine the defendant's ability to make a knowing and intelligent decision, or overpower the defendant's will." *Id.* at 1259. The district court, for example, should not

"discuss sensitive issues of trial strategy or tip the scales in favor of testifying or not testifying." *Id.* at 1257 (cleaned up).

What the district court did here fell well within those guardrails. At the start of the trial, Yliniemi's lawyer informed the district court that Yliniemi hadn't "made a final decision" on whether he'd take the stand. When the government finished its case in chief, the district court asked if Yliniemi would put on a case, and Yliniemi's lawyer said that Yliniemi was "choosing not to testify." So the district court addressed Yliniemi personally and asked him if he understood that he had the "right to either testify or not testify." While Yliniemi responded that he did, Yliniemi's counsel then informed the district court that Yliniemi was actually "torn between testifying and not testifying."

At that point, the district court asked Yliniemi some straightforward, neutral questions. The district court, outlining Yliniemi's rights, asked Yliniemi if he understood: (1) that he had no criminal history that could come in; (2) that the jury wouldn't be allowed to hold his decision against him if he chose not to testify; (3) that the jury would "weigh [his] testimony like any other witness"; (4) that he would be "subject to cross-examination" if he testified; and (5) that he could face a "perjury prosecution" if he said "anything untrue on the stand". Yliniemi doesn't claim that the district court's explanation was incorrect. And it's implausible that this neutral summary of Yliniemi's rights "overpower[ed] [his] will." *Id.* at 1259.

Even more, the district court repeatedly stressed that the decision to testify—or not to testify—was Yliniemi's alone. It explained that it was "not trying to influence [Yliniemi's decision] one way or the other," that the decision was one that "only" Yliniemi could make, that it was "completely [Yliniemi's] decision," and that Yliniemi's decision wouldn't "matter one way or the other" to the district court. Yliniemi confirmed that he understood that the decision was one that *he* had to make and that the district court was *not* looking to influence his decision. In short, the record shows that the district court did not "discuss sensitive issues of trial strategy or tip the scales in favor of testifying or not testifying." *Id.* at 1257 (cleaned up).

The record also shows that Yliniemi had enough time to decide to testify. As the district court pointed out, Yliniemi had been arrested more than three months before trial. On the morning trial began, the district court also alerted Yliniemi to the fact that he would need to decide whether to testify after the government finished its case—which, if things went "smoothly," would be later that day. When that happened, Yliniemi asked for more time to speak with his lawyer, and the district court granted that request, taking a fifteen-minute recess.[3] After they returned from the break,

_____

[3] Yliniemi also requested more time because he wanted to spend his "last night with [his] parents." The district court asked Yliniemi if he understood he wasn't "going to be shot" at the end of the trial. There's no evidence—nor does Yliniemi claim—that the district court's statement overpowered his decision on whether to testify.

Yliniemi never asked for more time. Instead, he told the district court that he "had the time [he] need[ed] to discuss" things with his lawyer. On these facts, Yliniemi's decision to testify was knowing, intelligent, and voluntary.

Our sister circuits have affirmed convictions under similar circumstances. In *United States v. Tull-Abreu*, 921 F.3d 294 (1st Cir. 2019), for example, the First Circuit found no error where the trial court "accurate[ly]" explained "the right not to testify and some potential consequences of choosing to testify (for example, possibly facing cross-examination)." *Id.* at 303. The defendant was also "granted a [thirty-minute] recess to contemplate the matter further and did not ask for more time after the recess." *Id.* The same thing happened here. There was no error. *See also, e.g.*, *Hollenbeck v. Estelle*, 672 F.2d 451, 452–53 (5th Cir. 1982) (holding that a district court's colloquy providing a neutral explanation of the right to testify was "a model of appropriate judicial concern for the constitutional rights of a criminal defendant"); *United States v. Goodwin*, 770 F.2d 631, 637 (7th Cir. 1985) (holding that a defendant's decision to testify was voluntary where the district court explained it "was not trying to steer her one way or the other" and gave her "time to talk things over").

## A clerical error

Although we affirm Yliniemi's conviction, there is a clerical error in his judgment. We can raise clerical errors in a judgment and remand with instructions to correct those errors. *See United States v. Massey*, 443 F.3d 814, 822 (11th Cir. 2006). The final

judgment states that Yliniemi pleaded guilty to counts one and two of the indictment. But Yliniemi was convicted of those counts after a jury trial. We remand to the district court with instructions to amend the judgment to correct this clerical error.

**AFFIRMED; REMANDED TO CORRECT A CLERICAL ERROR IN THE JUDGMENT.**