[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13947

_____

D.C. Docket No. 4:17-cr-00090-WTM-GRS-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL BRIAN ANDERSON,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 15, 2021)

Before WILSON, BRANCH, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Defendant Michael Brian Anderson, the owner of a shrimping business in

Savannah, Georgia, appeals his convictions for four counts of mail fraud, three

counts of making false statements, and two counts of money laundering.  In relevant part, a jury found him guilty of mailing U.S. Customs & Border Protection ("Customs" or "CBP") several forms, which falsely claimed large business expenditures from 2005 to 2007, as part of a scheme to acquire federal government subsidies under the Continued Dumping and Subsidy Act of 2000 ("CDSOA").  The CDSOA is a law designed to compensate domestic producers, including shrimpers, for losses that foreign producers caused by "dumping" underpriced goods into the American market.  On appeal, Defendant argues that the district court:  (1) erred in asking Defendant whether he waived his right to testify after defense counsel rested; (2) abused its discretion in declining to give Defendant's proposed jury instruction on the CDSOA; (3) violated Federal Rule of Criminal Procedure 30 by correcting an erroneous mail-fraud jury instruction after Defendant's closing argument; and (4) plainly erred in giving a modified *Allen*[1] charge similar to the pattern instruction.  After careful consideration, and with the benefit of oral argument, we affirm Defendant's convictions.

## I.    BACKGROUND

### A.    Indictment

A federal grand jury indicted Defendant on four counts of mail fraud, 18 U.S.C. § 1341 (Counts 1–4), three counts of making false statements to the

---

[1]  *Allen v. United States*, 164 U.S. 492 (1896).

Government, 18 U.S.C. § 1001(a)(3) (Counts 5–7), and two counts of money laundering, 18 U.S.C. § 1957(a) (Counts 8–9).  The indictment explained that, during the relevant time period, domestic shrimpers harmed by certain foreign anticompetitive conduct could apply for federal government subsidies by identifying their relevant business expenditures on "CBP Form 7401" and mailing the form to Customs.  The mail-fraud and false-statement counts alleged that, in attempting to gain these subsidies, Defendant had falsely claimed business expenses in the amount of $24,184,352.  The money-laundering counts alleged that Defendant had used the subsidy money fraudulently obtained to purchase stocks through Edward Jones Investment Company and to purchase real property through Lanier Realty.  The case proceeded to trial.

### B.     Trial

#### 1.     The Government's case-in-chief

In its case-in-chief, the Government showed the following.  Foreign producers sometimes engage in a form of anticompetitive conduct known as "dumping," which involves undercutting domestic producers by importing underpriced goods.  To level the playing field, Congress enacted the CDSOA, which allowed the United States government to levy duties on specific foreign goods and distribute the funds to affected domestic producers.  Under the CDSOA program, which Customs administered in conjunction with other agencies, affected

3

domestic producers could claim subsidies by identifying their business expenses on CBP Form 7401 and mailing the form to the Customs office in Indiana.  Customs would then use the claimed expenses to calculate each qualifying domestic producer's pro rata share of the funds and distribute the funds accordingly.

In 2005, the Department of Commerce issued an anti-dumping order that required several countries to pay tariffs for dumping shrimp into the U.S. market. The order allowed domestic shrimping businesses to apply for CDSOA subsidies based on expenses incurred after February 2005, up until September 2007, when the CDSOA was repealed.  CDSOA claims were cumulative, meaning that each year shrimpers could make a claim for all of their expenses incurred from the date of the anti-dumping order to the date of their claim.  Thus, claims would increase over the years, with a 2005 claim including only 2005 expenses, a 2006 claim including expenses from both 2005 and 2006, and a claim made in or after 2007 including all expenses incurred from 2005 to 2007.

Defendant owned and operated Shrimpy's, Inc., a shrimping business.  Each year from 2005 to 2014, Defendant mailed a copy of CBP Form 7401 to Customs, seeking subsidies for purported business expenses incurred during years 2005 to 2007.  In 2005, Defendant made a claim for $218,881 in expenses incurred that year.  In 2006, he made a claim for $374,138 in cumulative expenses incurred from

4

2005 to 2006. His 2007, 2008, and 2009 forms listed $8,256,222 in expenses incurred from 2005 to 2007.

In 2009, Defendant called the Customs help line to ask whether he could claim additional expenses that he had identified after filing his last CDSOA claim. Customs responded that he was permitted to claim additional expenses but that it might request an explanation for the increase. Thereafter, on his 2010–2014 CDSOA forms, Defendant claimed that his expenses from 2005 to 2007 exceeded $24 million. By contrast, Defendant's tax returns from 2005, 2006, and 2007 had listed his costs of goods sold as being $221,719, $307,683, and $0, respectively. Based on his CDSOA claims, Defendant received a total of $864,292.40 in federal subsidies.

In 2013, Customs received a tip from another shrimper that Defendant's claims were illegitimate. In response, Customs sent Defendant three letters asking for information supporting his claims. To substantiate his total claim for over $24 million in raw-materials expenses, Defendant included 47 invoices from R&R Seafood, which were identical except that they bore different dates ranging from February 2005 to September 2006 and listed different rates for shrimp. They stated that, on a biweekly basis, Defendant had purchased from R&R Seafood 100,000 pounds of "16 to 20 per pound head off/on shrimp" at a rate of either $610,000 or $630,000. According to Sean Wuethrich, Customs' programs

5

execution branch chief who oversaw the CDSOA program, the cost of purchasing shrimp could be claimed as a qualifying raw-materials expense. All in all, the 47 invoices purported to show that Defendant bought 4.7 million pounds of shrimp for more than $29 million over less than two years.

R&R Seafood, however, was incapable of supplying the quantities of shrimp specified in the invoices. Until his death in December 2006, Robbie Robertson owned R&R Seafood. Robertson operated the business with his common-law wife (Aletha Dean Carter), one employee, a short shrimping boat, an old pickup truck, a 1,200-foot facility, and an 8x10-foot freezer. As a small business, R&R Seafood did not have any of the equipment necessary for handling large quantities of shrimp, such as a forklift, a tractor-trailer, or a large freezer. On a good day during the shrimping season, Robertson would catch and sell only 100 to 200 pounds of shrimp out of R&R Seafood. He also briefly sold shrimp to Publix, but the relationship ended because he was able to supply only 50 to 200 pounds of shrimp per day, which was insufficient to meet the grocery store's demand.

When asked if R&R Seafood ever sold 100,000 pounds of shrimp, Carter responded, "Whoa. No. No way." Robertson's daughter and several members of the local shrimping community also thought it impossible that he ever possessed 100,000 pounds of shrimp at one time. Indeed, large shrimp-processing businesses in the community handled at most 400,000 pounds of shrimp in an entire year.

6

And the total amount of shrimp listed on the invoices exceeded the amount of shrimp caught in Chatham County and may have exceeded the total amount of shrimp caught in all of Georgia.

Setting aside the sheer quantity of shrimp listed on the invoices, there were other reasons to doubt their authenticity. Although the invoices were computer-generated, Robertson did not own a computer and R&R Seafood issued only handwritten, carbon-copy receipts. The address for R&R Seafood listed on the invoices was also incorrect. And many of the invoices were dated during the shrimping off-season, when it was illegal to catch domestic shrimp, as well as during the months preceding Robertson's death, when he was severely ill. While frozen shrimp was available year-round, R&R Seafood was closed in the off months and Robertson was not known to deal in block-frozen shrimp.

### 2. Defendant's case-in-chief

At the close of the Government's case, Defendant moved for a judgment of acquittal, arguing that insufficient evidence showed that he had made false statements or intended to deceive the Government.[2] The court denied the motion and Defendant presented his case. In particular, defense counsel sought to elicit from a special agent a purportedly exculpatory statement from Defendant that he found it more efficient to purchase shrimp than catch it himself. The Government,

---

[2] Sufficiency of the evidence is not at issue on appeal.

however, successfully excluded the statement. After the court sustained the Government's objection, the court commented that defense counsel had "done everything [she could] do to get in what he says without him having to take the stand and say it."

When the defense rested, the court excused the jury and asked Defendant (1) whether he understood that he had a right to testify if he wished and (2) whether it was his independent decision not to testify. Defendant confirmed that he understood his right to testify, but asked to speak to his lawyer before responding to the court's second question. The court permitted defense counsel to consult with Defendant outside the courtroom. When they returned, defense counsel reported that Defendant was unsure whether he wanted to testify. The court responded that Defendant would have to make a decision because the trial needed to continue, at which point Defendant said he would testify. Defense counsel did not object to the court addressing Defendant, who then took the stand.

Defendant testified that he had established a business relationship with Robertson, who used his contacts to obtain shrimp which Defendant could then ship to his customer in the Gulf Coast. According to Defendant, he would call Robertson and arrange to pick up a truckload of 20,000 to 50,000 pounds of frozen shrimp each week. Explaining the increase in his CDSOA claims, Defendant testified that he first learned that he could claim frozen shrimp as an expense

during a Southern Shrimp Alliance meeting around 2010.  He said that the increase

from $300,000 to $8 million in expenses resulted from his deals with Robertson,

and that, when he found additional receipts showing expenses over $24 million, he

called Customs to confirm that he could increase his claims.  Defendant denied

creating the R&R Seafood invoices, saying that he was not proficient on a

computer and that Robertson had given them to him.  On cross-examination,

Defendant admitted that he had mailed Customs the CDSOA claims, received

checks in the mail from the U.S. Treasury, and used these monies to invest through

Edward Jones and to pay Lanier Realty.  Defendant insisted that he had actually

incurred the expenses claimed on his CDSOA forms, based on deals with

Robertson.  After Defendant testified, the defense rested.

### 3.    Jury instructions and closing arguments

Before trial, Defendant requested that the court give a lengthy jury charge on

the CDSOA, which explained, in relevant part, that shrimp constituted a "raw

material" for which reimbursement was available under the CDSOA.  The court

denied the request, however, concluding that failure to give the charge would not

seriously impair the defense because Defendant was not charged with violating the

CDSOA and he could explain how the CDSOA operated through witnesses.

The parties also submitted proposed mail-fraud jury instructions based on

this Court's pattern charge.  The court agreed to give Defendant's requested

charge, which listed only one of the two alternative means the statute indicates can satisfy the jurisdictional basis for conviction. As it turned out, however, the evidence introduced at trial as to three of the mail-fraud counts revealed that the alternative means deleted by defense counsel in her request to charge was the means used by Defendant as to those counts. Alerted to that fact through defense counsel's closing argument, the district court supplemented the instruction that he had earlier agreed to give.

Defendant argues that the district court erred in its ruling as to both of these jury-instruction matters.

### 4.    Jury deliberations

The jury deliberated for just over two hours before sending the court a note asking how long they had to deliberate. Without objection, the court responded that they should continue deliberating until they reached a verdict and should inform the court if they could not agree on a verdict. Fifteen minutes later, the court received another jury note saying they could not reach an agreement and asking how they should proceed. The court called in the jury foreperson, who informed the court that several jurors had said additional deliberation would not make a difference.

After the foreperson left the courtroom, the court told the parties that it was going to give the jury an *Allen* charge because the jury had "not been deliberating

very long." The court immediately called in the jury and gave a modified *Allen* charge. No objections were lodged before or after the charge was given. Deliberations continued for nearly an hour and a half before the jury returned a verdict finding Defendant guilty on all counts.[3]

### C.    Post-Conviction Motions and Sentencing

After trial, Defendant moved for a judgment of acquittal on mail-fraud Counts 1, 3, and 4, arguing that the trial evidence (which showed that he had used a commercial mail carrier) and the jury instructions (which permitted a conviction based on use of a commercial mail carrier) materially varied from or constructively amended the indictment's charge that he had used the "United States mail." He also moved for a judgment of acquittal or a new trial on the ground that the court had violated Federal Rule of Criminal Procedure 30(b) by *sua sponte* changing the mail-fraud jury instruction after Defendant's closing argument. The court denied the motions.

At sentencing, the district court imposed a total sentence of 77 months' imprisonment, comprising concurrent terms of 77 months for each of Counts 1–4 and 8–9, and 60 months for each of Counts 5–7. Defendant timely appealed.

---

[3] Deliberations were briefly interrupted for five minutes, when the court was informed that the foreperson felt ill and another juror would take over her role as foreperson.

## II.    DISCUSSION

On appeal, Defendant argues that the district court (1) violated his right to testify, (2) abused its discretion in refusing to give his requested jury charge on the CDSOA, (3) violated Federal Rule of Criminal Procedure 30 by changing the jury instructions after Defendant's closing argument and declining to give a curative instruction after the Government's rebuttal closing, and (4) plainly erred in giving a modified *Allen* charge.  We address each issue in turn.

### A.    Whether the District Court Erred in Asking Defendant if He Wanted to Waive His Right to Testify

#### 1.    Defendant's contention

After the defense rested and outside the presence of the jury, the district court asked Defendant to confirm that he understood his right to testify and to indicate whether or not he wished to do so.  After consulting with counsel, Defendant opted to take the stand.[4]

---

[4]  We set out the brief colloquy:

| | |
|---|---|
| THE COURT: | All right.  Have a seat, please.  Mr. Anderson, you've heard your counsel announce that you have no more evidence to present in this case.  Do you understand that you have an absolute right to testify if you wish to testify? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | Is it your independent decision not to testify in this case? |
| THE DEFENDANT: | May I talk to my lawyer? |

12

A criminal defendant has a constitutional right to choose whether or not to testify, and that choice must be respected even if the defendant's attorney disagrees with his client's choice. If nothing more—and as a simple linguistic matter—it is clear that a trial court's inquiry as to whether a defendant wishes to testify or to remain silent is hardly an act that deprives the defendant of his right to choose. If anything, such a question serves to vindicate that right to choose. Nevertheless, Defendant argues on appeal that the district court's brief and neutral inquiry as to what Defendant wanted to do somehow violated his constitutional rights. Based on Defendant's contention that the district court's questions impermissibly interfered

---

| THE COURT: | Yes, sir. |
| MS. COPELAND: | Your Honor, may we step outside, please? |
| THE COURT: | Yes, ma'am. |
| (Brief pause in proceedings) | |
| MS. COPELAND: | Your Honor, thank you. And I am sorry. I think it is fair to say that at this point Mr. Anderson is not certain whether he wishes to testify. |
| THE COURT: | Well, he's going to have to be certain, because it's 4:00 in the afternoon and we're going to keep going. So – |
| THE DEFENDANT: | Let's do this. Let's testify. |
| THE COURT: | Is it his decision to testify? |
| MS. COPELAND: | It is, Your Honor. |
| THE COURT: | Okay. All right. Bring the jury back. |

with the attorney-client relationship, we assume that Defendant advances a Sixth Amendment claim that the court deprived him of the right to effective counsel.

We find nothing objectionable about the district court's straightforward and neutral inquiry, and certainly nothing in that inquiry that violated either Defendant's right to testify or his right to effective counsel. In explaining why, we first offer some legal background.

### 2.    Legal framework

A criminal defendant has a fundamental constitutional right to choose whether to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987); *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc). While the Constitution does not explicitly reference the right to testify, the Supreme Court has identified its sources in several constitutional provisions. *Rock*, 483 U.S. at 51. First, the "right to be heard and to offer testimony" is essential to the Due Process Clause's "guarantee that no one shall be deprived of liberty without due process of law." *Id.* Second, the right to testify is logically included in a defendant's Sixth Amendment rights "to call witnesses whose testimony is material and favorable" and "to conduct his own defense." *Id.* at 52 (quotation marks omitted). Finally, the right to testify is "a necessary corollary of the Fifth Amendment's guarantee against compelled testimony." *Id.* at 52–53.

Expanding on the meaning of this right, our Court in 1992 ruled that the decision to testify was not just another one of the many tactical decisions left solely up to defense counsel.  Rather, our Court en banc held in *Teague* that a defendant's right to choose whether to testify or instead to remain silent was a personal right of his that could not "be waived either by the trial court or by defense counsel."  *Teague*, 953 F.2d at 1532.  We reasoned that because "the right to testify essentially guarantees the right to ultimately *choose* whether or not to testify," a "defendant cannot be compelled to remain silent by defense counsel" any more than he can be "compelled to testify by defense counsel."  *Id.* (emphasis in original).

Although defense counsel is generally responsible for "matters which primarily involve trial strategy and tactics"—and deciding "whether a criminal defendant should take the witness stand in his own trial unquestionably has tremendous strategic importance"—we stressed that allowing a defendant to choose whether to testify did not conflict with his right to counsel.  *Id.* at 1531–33.  This was so, we explained, because an attorney and her client play different roles in the decision whether to testify.  "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide."  *Id.* at 1533.  "The defendant can then make the choice of

15

whether to take the stand with the advice of competent counsel." *Id.* In other words, the right to counsel guarantees a defendant the right to receive advice concerning his decision to testify, while the right to testify guarantees a defendant the personal right to choose whether to testify.

For the above reasons, *Teague* held that an ineffective-assistance-of-counsel claim is the appropriate vehicle for challenging defense counsel's alleged denial of her client's right to testify.[5] *Id.* at 1534. Since 1992 we have issued two other noteworthy decisions in cases where the criminal defendant relied on *Teague* in advancing his argument that his conviction should be reversed. Interestingly, whereas Defendant argues in the present case that the district court erred by even mentioning the right to testify, in both those earlier cases the defendants argued that the district court should have provided them more information about their right to testify. In *United States v. Van De Walker* we addressed a claim that a district court violated a counseled defendant's right to testify by failing to conduct a *sua sponte*, on-the-record inquiry into whether the defendant had knowingly,

---

[5] Ultimately, Teague did not get the relief he sought, which was a reversal of his conviction. The district court had earlier conducted an evidentiary hearing and concluded that Teague's will was not overborne by counsel, as he did not "protest" counsel's statement that she did not believe he should testify, albeit he did not affirmatively agree. Further, even though by the time of the evidentiary hearing defense counsel indicated that she had developed some "misgivings" as to whether Teague actually understood that he was choosing not to testify, the en banc court focused on what counsel reasonably understood to be her client's view during trial. And counsel testified that during trial she believed her client had acceded to her decision, albeit only tacitly. *Teague*, 953 F.2d at 1535.

voluntarily, and intelligently waived his right to testify at a trial. *United States v. Van De Walker*, 141 F.3d 1451, 1451 (11th Cir. 1998). Van De Walker never contended on appeal that his attorney failed to advise him of his right to testify or prevented him from testifying. *Id.* at 1452. That is, unlike Teague, he was not arguing that he was unaware that he had the right to insist on testifying, notwithstanding counsel's discouragement. Thus, Van De Walker was not asserting an ineffective-assistance-of-counsel claim. *Id.* Instead, Van De Walker argued that the Constitution required the reversal of any conviction in which the trial court had failed to ask a non-testifying defendant whether it was his choice not to testify. *Id.* And more than that—Van De Walker argued that, as a constitutional matter, the trial court is required to engage the defendant in a full dialogue to ensure that the defendant's waiver of his right to testify is knowing, voluntary, and intelligent. *Id.*

Our Court disagreed. *Teague* had acknowledged that it remained the duty of counsel to discuss "the strategic implications" and even to "advise the client in the strongest possible terms not to testify," if that was counsel's view. *Teague*, 953 F.2d at 1533. Further, in dictum, *Teague* had opined that "it would be inappropriate to require the trial court to <u>discuss</u> this choice with the defendant," as "[s]uch a requirement would unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant in his or her

17

choice." *Id*. at 1533 n.8 (emphasis added).  Drawing on those observations by the *Teague* court, our Court in *Van De Walker* rejected the defendant's argument that "there is a *per se* requirement that the district court advise the defendant of his right to testify and conduct an on-the-record inquiry into whether a non-testifying defendant knowingly, voluntarily, and intelligently waived the right to testify." *Van De Walker*, 141 F.3d at 1452.

Finally, in *United States v. Ly*, we examined whether a district court is required to correct the obvious misunderstanding of a *pro se* defendant who has expressed a belief that he has no right to testify.  *United States v. Ly*, 646 F.3d 1307, 1309 (11th Cir. 2011).  There, after the district court initiated a colloquy with *pro se* defendant Ly about whether he intended to testify, Ly indicated that, even though he would like to testify, he believed he would not be permitted to do so because he had no attorney to ask the questions for which he would provide the answers.  *Id.* at 1309, 1311–12.  Ly was of course wrong, as he would have been permitted to testify in narrative form.  *Id.* at 1312.  The district court, however, did nothing to correct his misunderstanding.  *Id.* at 1313.  Accordingly, Ly declined to testify, and the jury subsequently convicted him.  *Id.* at 1312.

On appeal following Ly's conviction, we reiterated that a court generally should not probe a defendant's reasoning as to whether or not to testify in order "to ensure that [his] decision [not to testify] was made knowingly and intelligently."

18

*Id.* at 1313.  First, because an "informed decision to testify requires [so] many considerations, including the defendant's credibility; how well the defendant would withstand cross-examination; and what types of damaging evidence would be admissible as impeachment," it would be difficult for a court to ever definitively determine whether the defendant's decision for or against testifying was an intelligent choice.  *Id.* at 1315.  Moreover, by injecting himself into the defendant's decision whether or not to testify, the judge might well suggest his own "implied preference," which would "intrude" into the defendant's personal decision.  *Id.* And where the defendant is represented by counsel, the judge's mimicking of the type of back-and-forth that a defendant should have had with his lawyer is an exercise that might "suggest that the district court believed the defendant's choice improvident," which suggestion "would improperly disturb the attorney-client relationship."  *Id.* at 1313.  In short, "[a] district court runs the risk of denying a defendant's right to testify by engaging in too searching of an inquiry."  *Id.* at 1318.

In the case before the *Ly* court, the district court had not engaged in any sort of colloquy with the *pro se* defendant other than to ask if he was going to testify. *Id.* at 1311–12.  Yet, the defendant's response to that question made clear that the defendant believed his *pro se* status prevented him from taking the stand.  *Id.*  This response having revealed a "basic misunderstanding regarding his fundamental

19

right to testify," we held that the district court should have corrected the defendant's misperception. *Id.* at 1318. The district court had not done so, and because we did not find the error harmless, we vacated the conviction. *Id.* at 1318–19.

### 3.     Analysis

Relying on our decisions in *Teague*, *Van De Walker*, and *Ly*, Defendant contends that by asking him whether he wanted to testify, the district court violated his constitutional rights. Necessarily, he is arguing either that the district court (1) usurped his right to choose whether to testify by asking him what that choice was or (2) rendered his counsel ineffective by the mere introduction of the topic, or both. As we have noted above, the first argument does not even track linguistically. And the second argument—that Defendant's counsel was rendered ineffective merely because the court asked Defendant what choice he had made— is similarly unpersuasive.[6]

First, none of the three cases referenced by Defendant ever held that a district court is prohibited from obtaining an on-the-record waiver of a criminal defendant's right to testify. And for good reason, as none of them dealt with a

---

[6] The Government contends that plain-error review applies because defense counsel did not object to the district court's colloquy at trial. Defendant disagrees. We need not resolve this dispute because even assuming *de novo* review applies, Defendant cannot prevail on his claim. *United States v. Waters*, 937 F.3d 1344, 1358 n.6 (11th Cir. 2019).

situation in which the trial judge sought such a waiver.  In *Teague* and *Van De Walker*, the district courts never mentioned the right to testify.  In *Ly*, for purposes of figuring out the next step in the proceedings, the district court simply asked the *pro se* defendant whether or not he was going to testify.  Moreover, in *Ly*, we never suggested that the judge said too much; we reversed because he said too little to the defendant concerning his right to testify.

True, in dictum in a footnote, *Teague* stated "it would be inappropriate to require the trial court to <u>discuss</u> this choice with the defendant," as "[s]uch a requirement would unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant in his or her choice."  *Teague*, 953 F.2d at 1533 n.8 (emphasis added).  But besides the fact that dictum does not bind future courts, the operative word in the *Teague* footnote is the word "discuss." Expounding on the perils of a trial court fully discussing the pros and cons of testifying—which would require a preview of the defendant's intended testimony, a thrashing out of his credibility, a discussion of his ability to respond effectively to potential cross-examination, as well the impact of any subsequent impeachment—*Ly* expressed concern that such an interaction between the court and the defendant would suggest the court's own preference.  *Ly*, 646 F.3d at 1315. And, according to *Ly*, that type of in-depth colloquy "would improperly disturb the

21

attorney-client relationship." *Id.* at 1313.[7]  But *Ly*'s dictum expressing disapproval

of excessive court involvement in the decision whether to testify says nothing

about the propriety of a court engaging in a limited, neutral colloquy intended to

make a record of the defendant's personal choice.  And, of course, *Ly*'s bottom line

faulted the district court for <u>not</u> advising the defendant of his right to testify.

As to *Ly*'s and *Teague*'s general concern that a district court not improperly

influence the defendant's choice by supplanting defense counsel and inserting

itself into the defendant's decision-making process, the district court's two, short

questions to Defendant here in no way delved into areas that were the sole

province of counsel in advising her client.  The district court did no more than ask

if Defendant knew he had a right to testify.  And when the Defendant said yes, the

court merely posed the obvious follow-up:  was it Defendant's decision not to

testify?  Obtaining an on-the-record confirmation that a defendant knows about his

right to testify and has chosen not to exercise it does not require a court to

---

[7]  As examples of "inappropriate" commentary by the trial court, *Ly* cited cases where courts had "insert[ed]" their "implied preference" about whether the defendant should take the stand, encouraging defendants to waive or exercise their right to testify. *Id.* at 1313, 1315 (citing *United States v. Leggett*, 162 F.3d 237, 248 (3d Cir. 1998) (noting that the district court had advised the defendant to follow his attorney's advice and not testify); *United States v. Joelson*, 7 F.3d 174, 178 (9th Cir. 1993) (noting that the district court had advised the defendant to follow his attorney's advice about whether to testify); *United States v. Goodwin*, 770 F.2d 631, 635–37 (7th Cir. 1985) (noting that the court "strongly implied that [the defendant's] only chance for acquittal was to testify")).

"discuss" sensitive issues of trial strategy or tip the scales in favor of testifying or not testifying.

Some of our sister circuits have noted their approval of on-the-record questioning as a means of protecting a defendant's right to testify. For example, in *United States v. Tull-Abreu*, the defendant complained that by apprising him of his right to testify, as well as related rights associated with that decision, the district court had coerced him into not testifying. *United States v. Tull-Abreu*, 921 F.3d 294, 302 (1st Cir.), *cert. denied*, 140 S. Ct. 424 (2019). The First Circuit disagreed, noting that "it is not uncommon for district judges to make sure defendants . . . are fully apprised of their testimonial rights," *id.* at 302–03, and further stating that "accurately making sure a defendant is fully apprised of his rights is not coercion or any such violation," *id.* at 303. *See also United States v. Stark*, 507 F.3d 512, 516 (7th Cir. 2007) (noting that "the court usually retains discretion" to "ask the defendant whether he generally understands that he is entitled to take the stand" and to "ask follow-up questions to determine whether the defendant had discussed his decision not to testify with his lawyer and to ensure that the final decision represented the defendant's personal choice"); *Hollenbeck v. Estelle*, 672 F.2d 451, 452–53 (5th Cir. 1982) (a district court's colloquy providing a neutral explanation of the right to testify was "a model of appropriate judicial concern for the constitutional rights of a criminal defendant.").

23

Indeed, some of these courts have specifically acknowledged the prudence of such a district court practice. *See Hartsfield v. Dorethy*, 949 F.3d 307, 315 (7th Cir. 2020) (suggesting that "prudent counsel may choose to put such waivers on the record outside the presence of the jury, as is standard practice in some courts," and that, "[e]ven though 'we do not require judges to question defendants regarding their desire to testify,' we certainly prefer it." (quoting *Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006)); *United States v. Mullins*, 315 F.3d 449, 455 (5th Cir. 2002) ("Careful defense counsel routinely advise the trial judge out of the jury's presence that the defendant will or will not testify, contrary to their advice. Even without its initiation by counsel, careful trial judges will similarly inquire if the defendant understands his right to testify.").

And, while a district court is not required to engage in this type of colloquy, it is hard to dispute the prudence of such a practice in terms of judicial economy. Specifically, *Teague* armed every non-testifying defendant with a potential ineffective-assistance-of-counsel claim to challenge his conviction: that is, even if untrue, a non-testifying defendant can simply assert that his attorney never told him he had a right to testify or that, although he told his attorney that he wanted to testify, the latter declined to put the defendant on the stand. For sure, a defendant inventing such a claim might not prevail. But absent some evidence in the trial record, that decision can usually be made only after an evidentiary hearing—and

24

post-conviction right-to-testify claims often require time-consuming proceedings. *See, e.g.*, *McGriff v. Dep't of Corr.*, 338 F.3d 1231, 1237–38 (11th Cir. 2003) (rejecting a claim that trial counsel prevented the defendant from testifying after the district court had conducted two evidentiary hearings on the issue); *Gallego v. United States*, 174 F.3d 1196, 1197–99 (11th Cir. 1999) (remanding for a new evidentiary hearing on an ineffective-assistance-of-counsel claim that "boiled down to 'the defendant's word against that of counsel'" about whether counsel informed the defendant about his right to testify); *Nichols v. Butler*, 953 F.2d 1550, 1552 (11th Cir. 1992) (en banc) (affirming the district court's finding, based on testimony at an evidentiary hearing, that the defendant's right to counsel was denied when his attorney coerced him into not testifying by threatening to withdraw mid-trial); *Neuman v. Rivers*, 125 F.3d 315, 319 (6th Cir. 1997) (affirming a finding that the defendant had knowingly and voluntarily waived his right to testify, after a state appellate court had remanded for an evidentiary hearing because the criminal record did not establish a waiver).

Moreover, resolving exactly what conversations occurred between an attorney and his defendant-client can be a difficult task in a post-conviction hearing if the two individuals contradict each other or if counsel professes a blurry recollection about an exchange that occurred years before. Indeed, given the uncertainty of accurately recreating a conversation between a defendant and his

25

counsel, it is the defendant who is actually telling the truth about his attorney's lapse who is possibly most harmed by a delay in confirming whether the defendant was made aware of his right to testify. In addition, while we believe that the overwhelming majority of attorneys would never purposely elect not to inform a client of his right to testify, an attorney's awareness that her silence on this point might undo a subsequent conviction gives rise to a perverse incentive for counsel to stay quiet.

An on-the-record waiver has the potential to nip these post-conviction issues in the bud, eliminating the basis for a claim that the defendant was denied the right to testify or teeing up the issue for the trial court to address on the spot. *See United States v. Camacho*, 40 F.3d 349, 355 (11th Cir. 1994) (affirming on direct appeal the district court's finding that counsel was not deficient, after counsel credibly testified at an evidentiary hearing that he had informed the defendant of his personal right to testify and that the defendant had made the ultimate choice), *overruled on other grounds by United States v. Sanchez*, 269 F.3d 1250 (11th Cir. 2001) (en banc); *United States v. Jones*, 844 F.3d 636, 645 (7th Cir. 2016) (addressing a right-to-testify claim on direct appeal and holding that the district court did not violate the right because, after three colloquies, the defendant provided a response that was an unequivocal waiver); *United States v. Hubbard*, 638 F.3d 866, 870 (8th Cir. 2011) (rejecting an ineffective-assistance-of-counsel

26

claim on direct appeal, after the district court held an evidentiary hearing where the defendant admitted that the district court had "fully informed [the defendant] of his right to testify" at trial); *Taylor v. United States*, 287 F.3d 658, 662 (7th Cir. 2002) (noting that "[p]utting this information on the record [that counsel has discussed the possibility of testifying with the defendant and that the defendant personally decides not to take the stand] may avoid later collateral attacks"); *United States v. Barrows*, 996 F.2d 12, 13–14 (1st Cir. 1993) (rejecting a claim that the defendant did not knowingly and intelligently waive his right to testify because the district court "fully advised [him] regarding his right to testify," informing him that "his prior convictions would be brought out if [he] testified," it was his "own decision" whether to testify, and he could ask the court questions about his rights).

Besides judicial economy, there is an even more obvious reason to reject Defendant's argument that a court should be disallowed from asking a defendant whether he wants to testify. Specifically, a defendant has a constitutional right to testify. It is an odd constitutional right that cannot even be mentioned to a defendant. Disallowing a procedure that permits immediate vindication of a right in favor of a protocol that might someday, years down the road, ensure that the right was honored seems a peculiar way to go about securing the right. Making a record of a defendant's choice, by contrast, ensures that the defendant's rights are protected. If anything, a court's practice in routinely asking a defendant these

27

questions enhances the effectiveness of counsel. Aware that that the court will ask the defendant whether he wants to testify, it is more likely that counsel will be sure to discuss this matter with her client ahead of time, meaning that the topic will be less likely to slip through the cracks during a fast-moving, hectic trial. And, as in this case, a brief colloquy can prompt a defendant to further consult with defense counsel, giving the attorney additional time to fully advise her client about the strategic implications of his decision, thereby protecting both the defendant's right to testify and the defendant's right to counsel. *See also Tull-Abreu*, 921 F.3d at 302 (colloquy provided multiple opportunities for counsel to further consult with the defendant).

We reiterate that a trial court is not required to inquire on this subject. And if it does so, it should avoid questions that probe trial-strategy issues or suggest the court's own opinion as to what choice the defendant should make—questions that might disturb the attorney-client relationship, undermine the defendant's ability to make a knowing and intelligent decision, or overpower the defendant's will. Here, in asking Defendant only whether he was aware of his right to testify and what he wanted to do, the district court fell well within the above guardrails. Nothing in the framing of the two neutral, straight-forward questions by the district court undermined Defendant's right to testify or improperly intruded into the attorney-client relationship by suggesting the court's contrary leaning as to what the

28

defendant should decide.  Accordingly, we reject Defendant's contention that his conviction should be reversed due to the district court posing these questions.

### B.    Whether the District Court Abused Its Discretion in Declining to Give Defendant's Requested Jury Instruction on the CDSOA

Before trial, Defendant asked the district court to give a lengthy jury charge on the CDSOA.  As relevant on appeal, the instruction explained that, because "shrimp is a raw material" in the shrimping industry, "a shrimp processor can make a claim under the CDSOA for the cost of shrimp bought from a shrimper." The court declined to give the instruction, concluding that the instruction was unnecessary because Defendant was not charged with violating the CDSOA and was free to present evidence on the issue.  Defendant challenges that decision on appeal.

"We review a district court's refusal to give a particular jury instruction for abuse of discretion." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).  "The failure of a district court to give an instruction is reversible error where the requested instruction (1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.* at 947–48.  "The Court applies a deferential standard of review to the jury instructions a trial court actually gives." *Id.* at 948. "Under this standard, we will only reverse if we are left with a substantial and

eradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* (quotation marks omitted).

Here, the district court did not abuse its discretion because the absence of the CDSOA instruction in no way impaired the defense. At trial, Defendant's theory of defense was that he had operated in good faith, submitting CDSOA claims for real expenses incurred in purchasing shrimp from R&R Seafood. Defendant contends that he needed the CDSOA instruction to make this argument because he could not otherwise explain to the jury that he was legally entitled to claim the purchase of shrimp. But there was never any dispute that Defendant could lawfully claim the cost of buying shrimp as a raw-material expense on his CDSOA forms. Indeed, the Government elicited testimony to that effect through Sean Wuethrich, who oversaw administration of the CDSOA for Customs, and the Government never argued that the law prohibited Defendant from claiming expenses incurred in purchasing shrimp. The Government instead argued that Defendant lied about incurring expenses and then sought to substantiate the claimed expenses with fake invoices, which purported to show transactions that in fact never occurred. The proposed CDSOA instruction had no bearing on these issues—which were the central disputed issues of fact at trial—and Defendant was free to pursue his good-faith defense without any legal or evidentiary impediment.

30

Accordingly, the district court did not abuse its discretion in refusing to give

Defendant's proposed CDSOA instruction.

**C.    Whether Federal Rule of Criminal Procedure 30(b) Requires Reversal Because the District Court Amended an Erroneous Mail-Fraud Instruction After Defense Counsel's Closing Argument**

1.    Lead-up to the alleged error

In arguing for reversal at oral argument, Defendant focused on the two

issues discussed above.  In his brief he also argues that his conviction should be

reversed because the district court violated Federal Rule of Criminal Procedure

30(b) by changing the mail-fraud jury charge after Defendant's closing argument

and then by failing to issue a curative instruction to the jury explaining the reason

for the divergence between what counsel had said would be the instruction and the

instruction the court ultimately gave.  We conclude that reversal is unwarranted on

Defendant's Rule 30 challenge.

Before trial, the parties each submitted proposed jury instructions.  As to the

substantive charge of mail fraud, this Court's pattern instruction provides that use

of either the United States Postal Service or a private interstate carrier meets the

jurisdictional "mailing" requirement of the statute:

> It's a Federal crime to [use *the United States mail*] [transmit something by *private or commercial interstate carrier*] in carrying out a scheme to defraud someone.  The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:  . . . the Defendant used [*the United States Postal Service* by mailing or by causing to be mailed] [*a private or commercial interstate carrier* by

31

depositing or causing to be deposited with the carrier] something meant to help carry out the scheme to defraud.

Eleventh Circuit Pattern Jury Instructions, Criminal Cases, O50.1 Mail Fraud (2017) (brackets in original) (emphasis added). In short, the pattern instruction mimics the mail-fraud statute in indicating the existence of these two alternative means for satisfying the jurisdictional element. The pattern instruction further defines a "private or commercial interstate carrier" as "includ[ing] any business that transmits, carries, or delivers items from one state to another," and clarifying that "[i]t doesn't matter whether the message or item actually moves from one state to another as long as the message or item is delivered to the carrier." *Id.* In other words, a person can be found guilty of mail fraud if he uses the U.S. Postal Service, a private or commercial carrier like UPS, or both to commit fraud.

As noted in the background section above, the nine-count indictment here charged Defendant with four counts of mail fraud. In his proposed instruction defining mail fraud, Defendant deleted from the pattern instruction any reference to a "private or commercial interstate carrier," as well as the definition of that term. As a result, Defendant's proposed charge stated that mail fraud involved using "the United States mail" in a scheme to defraud and that a guilty verdict required a finding that Defendant "used the United States Postal Service" in his scheme. By contrast, the Government's proposed mail-fraud instruction deleted only the first reference to a "private or commercial interstate carrier." In describing the

32

elements of the offense, the Government retained the pattern instruction's references to both "the United States Postal Service" and "a private or commercial interstate carrier," placing the word "and" between the two alternative means of satisfying the jurisdictional element.  The Government also included the pattern instruction's explanation of the term "private or commercial interstate carrier."

A week before trial, the court sent the parties a draft of the jury charges it intended to give.  The court's draft adopted Defendant's version of the charge, which omitted any reference to a private or commercial carrier.  When asked during the first day of trial whether the parties had any objections to its draft charges, the Government stated that it had no objections.  At the close of evidence, the court again asked whether there were any issues with its draft charges, and neither party mentioned the mail-fraud instruction.

In its summation, the Government focused almost exclusively on the pivotal question at trial:  had Defendant lied by claiming entitlement to subsidies based on inflated business expenses?  The prosecutor also briefly summarized the court's anticipated mail-fraud jury charge, including the part indicating that mail fraud required use of the U.S. Postal Service.  In doing so, the prosecutor pointed out the relevant exhibits and noted that there was no dispute that Defendant had mailed the three claims for subsidy payments that corresponded with three of the mail-fraud counts and that the Government had mailed the check sent to Defendant, which

33

represented the fourth mail-fraud count. The three exhibits that the prosecutor referred to, however, included shipping labels showing that Defendant had sent the forms via a commercial carrier, UPS, not the U.S. Postal Service (USPS). The prosecutor's mistake would normally have been of no moment, given that evidence showing that a defendant had used a commercial interstate carrier satisfies the jurisdictional element of the statute. The oversight by the prosecutor gave rise to the present problem, however, because the Government had not objected to defense counsel's request for an instruction that entirely omitted the use of a private or commercial interstate carrier as a ground for finding Defendant guilty.

In her own closing argument, defense counsel spent almost all of her time focusing on what had been Defendant's defense throughout the trial: that Defendant had acted in good faith in making his claims for federal subsidies, meaning that the Government had failed to prove that Defendant had acted with an intent to defraud. Toward the end of her closing, defense counsel—who had obviously examined the above-described exhibits more closely than had her Government counterpart—briefly touched on the shipping labels for the claims that corresponded to three of the four mail-fraud counts. Counsel noted that the court would be charging the jury that the Government was required to prove that the defendant had "used the United States Postal Service." Stating that the shipping

34

labels for three of the claims showed the use of UPS, not the U.S. Postal Service, she offered this fact as an additional basis for reasonable doubt.

Defense counsel's statement obviously caught the district court's attention, as immediately after defense counsel had concluded her argument, the court called a recess. Then, outside the presence of the jury, the court informed the attorneys that it was going to amend the mail-fraud jury instruction to make clear that use of either the U.S. Postal Service or a private or commercial interstate carrier satisfied the mail-fraud statute's jurisdictional element. The court indicated it did not know why the parties had deleted the appropriate language from the requested charge. Nevertheless, noting that it had just heard defense counsel argue that "there can't be any mail fraud here because you see right here, this was sent by UPS," the court responded, "And that's just not the law. And I'm not going to charge this jury on something . . . that's not the law." Defense counsel neither explained to the court her reason for deleting the private-or-commercial-carrier aspect of the instruction in her requests to charge nor voiced any objection to the instruction the judge said he would be giving.

The jury was called back in and the prosecutor gave her rebuttal argument. Like its earlier summation, the Government's rebuttal focused on evidence suggesting that Defendant had not bought the enormous quantity of shrimp he had claimed, which, if so, would mean that his subsidy claims were highly inflated.

Halfway through rebuttal, and based on the court's statement that it would be revising the instruction, the prosecutor made an isolated comment about the "UPS" issue, stating: "And don't let Ms. Copeland's definition of mail fraud confuse you. The judge will instruct you that UPS counts. So he's guilty of everything else." The prosecutor then returned to her argument concerning the absence of any reasonable doubt about Defendant's intent to defraud.

At the conclusion of the Government's rebuttal argument, defense counsel asked for a curative instruction, arguing that the Government had suggested that she purposely misled the jury about the court's instructions. Counsel explained that the indictment had said "U.S. Mail" and that the Government had not objected to the instruction she had recited during her closing argument.[8] The court disagreed that the jury would have gotten the impression that counsel was being dishonest, opining that the whole thing had likely "passed over their head" and that the court saw no need for a curative instruction. In summary, the court explained its thinking: "The charge needs to conform to the evidence and the law, and all this charge does is conform to the evidence and the law . . . . I'm not going to give any type of curative instruction that calls any special attention to it."

---

[8] Accordingly, she asked, "May I have a curative instruction saying to the jury something along the lines that the pattern charge or the—I don't want the jury to think that I was lying to them, Judge, because I wasn't. I was arguing from the charge that we had."

After the jury convicted Defendant on all counts, Defendant filed a motion for judgment of acquittal and a motion for a new trial based on the district court's modification of the proposed mail-fraud charge. In arguing for a judgment of acquittal, Defendant argued that, by instructing the jury that the jurisdictional element could be satisfied either by the use of the U. S. Postal Service or a commercial carrier, the district court had constructively amended the indictment. Alternatively, Defendant argued that even if the instruction did not constructively amend the indictment, acquittal was warranted because the evidence presented at trial materially varied from the indictment.[9]

The district court denied the motion for judgment of acquittal. In rejecting Defendant's contention that the revised instruction broadened the basis for conviction beyond what was contained in the indictment and therefore constructively amended the indictment, the court noted that the indictment had "never specified that Defendant used the U.S. Postal Service to devise his scheme to defraud the Government." Rather, the court noted, "the indictment referenced 'mailings' throughout a detailed account of the Defendant's purported scheme and referred more generally to the 'United States mail.'" The court interpreted the

---

[9] In arguing for a new trial, Defendant argued that the revised jury instruction violated Federal Rule of Criminal Procedure 30(b). The district court denied the motion. Defendant now pursues that same argument on appeal. As noted *infra*, Defendant has abandoned any argument that the instruction constituted a constructive amendment of the indictment or that there was a material variance between the indictment and the evidence the Government presented at trial.

37

indictment's overarching reference to "mail" and "mailings" as "broadly encompass[ing] both the U.S. Postal Service and other private carriers—including UPS." In short, the court concluded that its instruction permitting conviction so long as either type of entity was used did not constitute a constructive amendment of the indictment.

For the same reasons, the court rejected Defendant's related contention that there had been a material variance between the indictment and the evidence presented at trial. In any event, the court noted, a defendant must demonstrate that he suffered prejudice to succeed on an allegation of a material variance; that is, he must show that he had not been placed on notice of the charges against him and therefore was unable to prepare a defense. The district court observed that this was clearly not the case as to the variance alleged by Defendant. Defendant knew full well what the evidence was and there was no indication defense counsel had experienced any difficulty preparing her case based on the wording of the indictment.

On appeal, Defendant has not challenged the district court's ruling that there was neither a constructive amendment of the indictment nor a material variance. The only claim Defendant advances regarding this issue is his contention that the district court violated Rule 30(b) when it supplemented the instruction after defense counsel's closing argument, which is the argument to which we next turn.

38

2.      Analysis

On appeal, Defendant argues that the district court violated Federal Rule of Criminal Procedure 30 by amending the draft mail-fraud jury instruction after defense counsel's closing argument.  Rule 30 requires the court to "inform the parties before closing arguments how it intends to rule on the requested instructions."  Fed. R. Crim. P. 30(b).  We require "substantial compliance with Rule 30, and a conviction will be reversed due to a violation of the Rule only where a defendant establishes prejudice."  *States v. Pena*, 897 F.2d 1075, 1084 (11th Cir. 1990), *abrogated on other grounds*, *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1994).  Reversal may be warranted "when the change in the instructions is substantial, when the judge's instructions repudiate counsel's argument, or when the judge's instructions impair the effectiveness of the attorney's argument."  *Id.* (quotation marks omitted).  At the same time, "the court retains power to remedy omissions in pre-argument instructions or to add instructions necessitated by the arguments."  *Id.* (quoting from Fed. R. Crim. P. 30 advisory committee's notes to 1987 amendments).  Ultimately, in gauging prejudice, we look to whether the revision of the instruction "so undermined defense counsel's effectiveness" or "the defense as to require reversal."  *United States v. White*, 27 F.3d 1531, 1538, 1539 (11th Cir. 1994).

39

First things first.  To the extent that defense counsel believed that no conviction was sustainable on the three mail-fraud counts involving use of UPS because the indictment did not specify UPS, the route to litigate that claim was through a motion for judgment of acquittal at the close of the Government's case. But counsel did not move for acquittal on that ground.[10]  That being the case, the judge's duty in instructing the jury was, as the district court put it, to give a charge that conformed to the evidence and the law.  As defense counsel indicated in her own closing argument, the evidence showed that UPS was used to perpetrate the fraud in three mail-fraud counts.  Accordingly, a correct statement of the law required the court to instruct the jury whether use of a private or commercial interstate carrier such as UPS satisfies the jurisdictional element of the offense, and of course it does.  Stated another way, had the district court told the jury that it could not find Defendant guilty unless it found that the U.S. Postal Service had been used, the court would have knowingly instructed the jury contrary to what the law provides.  Giving the jury the wrong explanation of the applicable law contradicts the entire purpose of a jury instruction.  Understandably, that was anathema to the district court.

---

[10]  And, as noted, while counsel ultimately filed a post-conviction motion for acquittal on that ground, she has not pursued an appeal of the district court's rejection of that argument.

The problem though was that the court had earlier approved an instruction offered by defense counsel that, as a legal matter, wrongly stated that use of the U.S. Postal Service was the only means by which the jurisdictional element could be proved. And having approved that instruction, Rule 30(b) came into play when the court later changed that instruction after defense counsel's closing argument. To repeat, Rule 30(b) requires that the district court inform counsel whether it will give a requested instruction prior to counsel's closing argument.

Of the relatively few cases addressing alleged Rule 30(b) violations, none deal with these unusual facts here, which are: (1) an offense provides for two means (A and B) of proving an element; (2) defense counsel requests and receives an instruction stating that the jury can convict only if the Government proves that Means A was used, but prior to closing argument, defense counsel knows full well that the evidence has established that the defendant used only Means B; (3) having heard no objection from the Government as to the instruction, the district court is unaware prior to closing arguments that the evidence shows that the defendant used only Means B—meaning that the district court's earlier-approved instruction totally misstates the law; (4) the district court becomes aware of the mistake only when defense counsel announces during her closing argument that Means B, which is not addressed by the instruction, was in fact used; and (5) armed with this new information—which was unknown to it when it agreed to give the defendant's

41

requested instruction—the court announces immediately after defense counsel's closing argument that it will supplement its earlier-approved instruction by informing the jury that the defendant's use of either Means A or Means B may establish the particular element.

No question, these odd facts do not neatly fit into any analytic pigeon-hole for purposes of Rule 30(b). Nonetheless, we must decide whether the supplementation of the instruction warrants reversal of the conviction on these three mail-fraud counts. And to do so we look to the overriding purpose behind Rule 30(b), which is to alert counsel to the legal instruction that the court will give the jury so that counsel can best tailor her argument to the evidence and that instruction. Yet, to repeat, even though Rule 30 seeks to ensure that counsel can intelligently argue the case to the jury, it does not "empower counsel, through the mechanics of the closing argument, either to dictate the law by which a verdict is reached or to create a mistrial by erroneously stating the legal principles applicable to a given situation." *Pena*, 897 F.2d at 1085. Rather, under Rule 30, the court still maintains some power "to add instructions necessitated by the arguments." *Id.* at 1084 (quotation marks omitted).

Accordingly, in *Pena*, we held that a district court substantially complied with Rule 30 when defense counsel's misstatement of the law in closing arguments necessitated a change to the jury instructions, even though the defendants suffered

42

some prejudice as a result. *Id.* at 1084–85. There, two defendants were charged with importing marijuana into the United States, after authorities detected their airplane flying beyond the United States customs boundary over the Gulf of Mexico toward Florida. *Id.* at 1076–77. At the charge conference, the district court said it would instruct the jury that "to import a substance" meant "to bring or transport that substance into the United States from some place outside the United States." *Id.* at 1080. Defense counsel did not request a jury charge on the legal meaning of "some place outside the United States" but incorrectly argued in closing arguments that it meant "from a land place or flying to a boat outside the United States." *Id.* To fix the misconception created by defense counsel, the court supplemented the jury instruction, charging the jury that "a place outside the United States" included "air space in excess of 12 geographical miles seaward from the coast of Florida." *Id.* On appeal, we affirmed the defendants' convictions. *Id.* at 1084–85. Although the supplementary charge "repudiated one of counsel's arguments" and may have diminished counsel's effectiveness, we held that the district court did not violate Rule 30 because "defense counsel's blatant misstatement of the law" necessitated the supplementary instruction, and ignoring the misstatement "would have resulted in a verdict reached in contravention to the law." *Id.* Further, "[t]he change in the instructions was not substantial." *Id.*

43

Granted, the facts are somewhat different here than in *Pena,* as defense counsel in that case had not earlier obtained court approval of a jury instruction supporting the particular argument he offered in closing argument. Here, by contrast, the court had previously approved Defendant's proposed instruction indicating that use of the U.S. Postal Service was the sole means of committing mail fraud, an instruction that turned out to be blatantly incorrect as a legal matter, given the evidence defense counsel relied on in closing. Nonetheless, as in *Pena*, the court here would have failed to fulfill its duty to correctly state the law for the jury had it not supplemented the approved jury instruction.

The question we must examine here is the extent to which Defendant was unfairly prejudiced by the district court's subsequent revision of the instruction that defense counsel had paraphrased in her closing argument. The answer: there was little prejudice at all, and certainly no unfair prejudice. First, the overriding issue in the case for both the prosecution and the defense—during both trial and closing arguments—was whether Defendant had falsely inflated the quantity of shrimp he had purchased for the purpose of defrauding the relevant federal agency administering the subsidy program. Any instruction regarding the means Defendant had used to send his subsidy claims had nothing to do with the theory of defense, which was that Defendant had acted in good faith in making his claims. Indeed, defense counsel made only a passing reference to the mailing element,

44

understandably using almost all her allotted summation time to spell out why there was reasonable doubt that Defendant had acted with intent to defraud the Government. Thus, the court's supplementation of the instruction did not repudiate the thrust of defense counsel's summation. *See United States v. Foppe*, 993 F.2d 1444, 1451–52 (9th Cir. 1993) (concluding that "whatever loss of credibility [defense] counsel may have suffered" from the court's omission of a proposed instruction that counsel told the jury the court would give "[was] not sufficient prejudice to merit reversal," where the court's actual instruction did not repudiate the core of defense counsel's summation).

Nor does Defendant argue that the change to the instructions was substantial, such that defense counsel's reliance on the instruction could have caused significant prejudice. In a case where the court has a change of heart about giving a requested jury charge after defense counsel has made critical strategic decisions about how to approach closing arguments, a Rule 30 violation is apt to cause substantial prejudice. *See, e.g.*, *United States v. Gaskins*, 849 F.2d 454, 460 (9th Cir. 1988) (concluding that reversal was warranted where the court ruled before closing arguments that it would not give an aiding-and-abetting instruction but decided in response to a jury question to give the instruction, thereby preventing defense counsel from presenting viable theories of defense); *see also United States v. Harvill*, 501 F.2d 295, 297 (9th Cir. 1974) (holding that the court's instruction

45

that specific intent was not required caused substantial prejudice by repudiating defense counsel's closing argument, which in part stressed the issue of specific intent based on the court's prior decision to give a requested instruction on the issue).

But this is not such a case. The district court here instructed the jury that the Government bore the burden of disproving Defendant's good faith, which issue was the foundation of Defendant's theory of his defense. The court's decision to add back into the pattern instruction the alternative means of satisfying the mail-fraud statute's jurisdictional element merely served to remove potential confusion about the governing law, something that a complete pattern instruction resolved. *See United States v. Shirley*, 435 F.2d 1076, 1078 (7th Cir. 1970) (finding no prejudice from the court giving an additional instruction that "simply removed a potential source of confusion concerning the elements of the crime," where the evidence at trial in conjunction with defense counsel's closing argument created a risk that the jury might not understand the charge). Plus, victory on these three mail-fraud counts based on insufficient jurisdictional evidence would have gained Defendant very little as he was convicted on a fourth mail-fraud count based on the subsidy check issued to him, as well as on three false statement counts that charged the same fraudulent conduct identified in the three mail-fraud counts at issue. For

those false statement counts, it mattered not at all what mailing service Defendant had used to send his claims.

True, Rule 30(b) exists to prevent an attorney from being surprised by an instruction that might contradict the attorney's theory of the case, as expressed in closing argument. Yet, the record reveals no surprise on counsel's part when the district court called a recess after defense counsel's closing argument, indicated that counsel's argument totally misstated the law, and stated that it would supplement the instruction previously approved to say that the jurisdictional element could be satisfied by use of either a commercial carrier or the U.S. Postal Service. Defense counsel voiced no disagreement with the Court's statement or any objection to its stated plan to supplement the instruction. Indeed, Defendant does not argue that changing the jury instruction after his closing argument prevented him from presenting any point to the jury that could withstand judicial scrutiny. *United States v. Walter-Eze*, 869 F.3d 891, 910–11 (9th Cir. 2017) (holding that the defendant did not suffer prejudice from the addition of a deliberate-ignorance instruction where defense counsel made the instruction relevant in summation and was not prevented from making any points essential to the defense). In fact, Defendant admitted on the stand that he had "mailed" the CDSOA forms to Customs.

47

None of which is to suggest that we are accusing defense counsel of wrongdoing. To the contrary, it was not defense counsel's job to coach the Government as to the need to object to an instruction for which an objection was clearly in order. Nor was it defense counsel's job to alert the prosecutor that the latter might perhaps want to read more carefully the Government's own exhibits. Defense counsel did her job; the Government should have been more diligent in handling its own responsibilities. All the same, the district court had agreed to give an instruction that it reasonably thought conformed to the relevant evidence. Defense counsel, a very able and experienced attorney, had to foresee the possibility that the court would take corrective action once it realized that the instruction it had agreed to give was not just legally incomplete, but flat out wrong under the circumstances. Accordingly, defense counsel must have anticipated any prejudice that Defendant experienced—which was quite slight—when she received agreement to an instruction that did not conform to the evidence. In short, Defendant has not shown prejudice warranting reversal of the three mail-fraud convictions based on the district court's decision to supplement its previously-approved instruction after defense counsel's summation.

Defendant argues, however, that even if his defense was not prejudiced by the court's supplementation of the instruction, defense counsel's effectiveness was undermined when the Government suggested in rebuttal that defense counsel had

48

misled the jury by arguing that Defendant could not be convicted for mail fraud if he used UPS.[11]  Although defense counsel failed to object when the court informed her at the conclusion of her own argument that the court would supplement the instruction, once the Government concluded its rebuttal argument, counsel did ask the court to give a curative instruction informing the jury that counsel had not attempted to mislead the jury.  The district court declined, explaining that in the judge's opinion, such an instruction was unnecessary and would focus undue attention on what the court thought was an insignificant issue that had likely "passed over [the jury's] head."

We disagree that reversal of Defendant's conviction is warranted based on the prosecutor's remark and the district court's refusal to give a curative instruction.  That said, we understand defense counsel's frustration that the prosecutor did not attempt a more balanced explanation of what had happened.  After all, in her own summation, the prosecutor had quoted from the same instruction regarding the jurisdictional element that defense counsel had used.   For sure, once aware that the district court would supplement its instruction to include use of UPS as a viable basis for finding the jurisdictional element, the prosecutor had to say something in rebuttal to alert the jury to that fact.  A more graceful

---

[11]  To repeat, the prosecutor stated, "And don't let Ms. Copeland's definition of mail fraud confuse you.  The judge will instruct you that UPS counts.  So he's guilty of everything else."

explanation would have informed the jury that both attorneys had made a mistake in reciting the language of the instruction and that, instead, the instruction the court would give would indicate that use of a commercial interstate carrier satisfied the relevant element of the mail-fraud statute.

And in fact, turning our hindsight vision to defense counsel, when the district court announced that it would revise the instruction, instead of remaining mute, defense counsel should have explored with the court the appropriate way to communicate that decision to the jury, such that any remarks the prosecutor subsequently made during rebuttal would have been better scripted. As to defense counsel's request for a curative instruction, it would likewise have been useful for the district court to explain to the jury as part of its instruction on the elements of mail fraud that there had been a mistake in the drafting of the instruction, which both attorneys had recited during their closing arguments, and that the court had now corrected this mistake.

Nevertheless, none of these things happened. And while in retrospect the matter could have been handled better, the district court's refusal to give a curative instruction regarding the prosecutor's brief comment—a decision that we review under the generous abuse of discretion standard—does not warrant reversal. *See United States v. Palma*, 511 F.3d 1311, 1317 & n.4 (11th Cir. 2008). We conclude that the prosecutor's remark was simply not a significant enough matter to justify

upending a conviction that appears to have been based on overwhelming evidence.

Accordingly, we decline to reverse Defendant's conviction based on the court's

alleged Rule 30 violation or its refusal to give a curative instruction.

**D.      Whether the District Court Plainly Erred in Giving a Modified**
         ***Allen* Charge Similar to the Pattern Instruction**

Defendant argues for the first time on appeal that the language of the district

court's *Allen* charge was impermissibly coercive.  Because Defendant did not

object at trial, we review the district court's *Allen* charge for plain error.  *United*

*States v. Jones*, 504 F.3d 1218, 1219 (11th Cir. 2007).  Plain error occurs when

(1) there was an error, (2) the error was plain or obvious, (3) the error affected the

defendant's substantial rights, and (4) the error seriously affected the fairness,

integrity, or public reputation of the judicial proceedings.  *United States v.*

*Johnson*, 694 F.3d 1192, 1195 (11th Cir. 2012).

"The Supreme Court held long ago that a trial court may instruct a

deadlocked jury to keep deliberating," an instruction commonly referred to as an

*Allen* charge.  *United States v. Davis*, 779 F.3d 1305, 1312 (11th Cir. 2015) (citing

*Allen v. United States,* 164 U.S. 492, 501–02 (1896)).  Although we have criticized

the practice of giving *Allen* charges, we have squarely held that they are

permissible.  *Id.* (citing *United States v. Rey,* 811 F.2d 1453, 1459–60 (11th Cir.

1987)).  "A district court has broad discretion in this area but must not coerce any

juror to give up an honest belief."  *Id.*  "We will find that a district court has

51

abused its discretion in giving a modified *Allen* charge only if the charge was inherently coercive." *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008) (alteration accepted). To determine whether a charge was impermissibly coercive, "we consider the language of the charge and the totality of the circumstances under which it was delivered." *Id.*

Here, it is undisputed that the district court's modified *Allen* charge largely tracked this Court's pattern instruction, which we have approved "on numerous occasions." *United States v. Bush*, 727 F.3d 1308, 1320 (11th Cir. 2013) (quoting *Woodard,* 531 F.3d at 1364). Accordingly, Defendant's argument hinges on specific differences between the pattern instruction's language and that of the district court's charge. But the argument fails from the outset because Defendant has not identified any binding precedent holding that the court's novel language renders an otherwise acceptable *Allen* charge impermissibly coercive. *See Johnson*, 694 F.3d at 1195 ("In order for an error to be obvious for purposes of plain error review, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule." (quotation marks omitted)). Indeed, the only case Defendant relies on to show plain error is *United States v. Rey*, 811 F.2d 1453 (11th Cir. 1987), a case where a panel of this Court expressed a desire to eliminate *Allen* charges but concluded that precedent bound it to uphold a charge that—like the one here—"was virtually identical to the pattern Allen

52

instruction for this circuit." *Rey*, 811 F.2d at 1458–60.  Defendant has therefore failed to carry his burden of showing plain error.

Even if we accepted Defendant's argument that we should review his claim for an abuse of discretion, which we do not, we discern no error in the district court's modified *Allen* charge.[12]  Defendant argues that six linguistic differences rendered the court's charge impermissibly coercive.

|   | Pattern Instruction[13] | District Court's Instruction |
|---|---|---|
| 1 | If you fail to agree on a verdict, the case will be left open and <u>may</u> have to be tried again. | If you should fail to agree on a verdict, then the case is left open and <u>must</u> be tried again. |
| 2 | <u>Another trial would increase the cost to both sides</u>, and there is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried before you. | And obviously another trial would <u>only serve to increase the cost to both sides</u>, and there's no reason to believe that the case can be tried again by either side better or more exhaustively than it's been tried before you. |
| 3 | If a substantial majority of you are in favor of a conviction, <u>those of you who disagree</u> should reconsider whether your doubt is a reasonable one since it appears to make no effective | If a substantial majority of your number are for a conviction, then <u>each dissenting juror</u> ought to consider whether a doubt in his or her mind is a reasonable one since it appears to make no effective |

---

[12] We reject Defendant's argument that he did not have an opportunity to object at trial, and thus that we should review for an abuse of discretion.  Because the district court stayed on the bench to address other matters after giving the *Allen* charge, the record shows that Defendant had a chance to object.

[13] Eleventh Circuit Pattern Jury Instructions, Criminal Cases, T5 Modified Allen Charge (2017).

| | | | |
|---|---|---|---|
| | | impression upon the minds of the others. | impression upon the minds of the others. |
| | 4 | On the other hand, if a majority or even a smaller number of you are in favor of an acquittal, the rest of you should ask yourselves again – and most thoughtfully – whether you should accept the <u>weight and sufficiency</u> of evidence that fails to convince your fellow jurors beyond a reasonable doubt. | On the other hand, if a majority or even a lesser number of you are for acquittal, the other jurors seriously ought to ask themselves again, and most thoughtfully, whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors and whether they should distrust the <u>weight and efficiency</u> of evidence which fails to convince several of their fellow jurors beyond a reasonable doubt. |
| | 5 | Remember at all times that no juror is expected to <u>give up an honest belief</u> about the weight and effect of the evidence. | Remember at all times that no juror is expected to <u>yield a conscientious conviction that he or she may have</u> as to the weight or effect of the evidence. |
| | 6 | But after fully considering the evidence in the case you must agree upon a verdict <u>if you can</u>. | But remember also that after full deliberation and consideration of the evidence in the case, it's your duty to agree upon a verdict, <u>if you can do so without surrendering your conscientious conviction</u>. |

(Emphasis added).

This side-by-side comparison makes clear that the district court's deviations

from the pattern instruction were minor wording changes. Defendant fails to show

how that the district court's use of synonymous or near-synonymous terms and

phrases rendered the court's modified *Allen* charge any more confusing or coercive

than the pattern instruction, which we have repeatedly upheld. *See Bush*, 727 F.3d at 1320.

Finally, to the extent that Defendant argues the charge was coercive because "only an hour elapsed between the *Allen* charge and the jury's verdict," we are unpersuaded. The jury continued deliberating for another hour and a half after the charge, suggesting that jurors in the minority did not feel forced to roll over without engaging in further conscientious deliberation. *See Rey*, 811 F.2d at 1458, 1460 (affirming convictions where the jury deliberated for an hour and a half after receiving an *Allen* charge, and noting that the circumstances were no more coercive than in a former Fifth Circuit case where the jury deliberated for only 25 minutes after receiving an *Allen* charge); *United States v. Bailey*, 468 F.2d 652, 664–65 (5th Cir. 1972) (concluding that an *Allen* charge was not impermissibly coercive where the jury continued deliberating for an hour and a half after receiving the charge), *aff'd on reh'g,* 480 F.2d 518 (5th Cir. 1973) (en banc).

Accordingly, the district court did not err, plainly or otherwise, in giving the modified *Allen* charge.

## III.    CONCLUSION

After careful consideration, we conclude that the district court (1) did not err in requesting an on-the-record waiver of Defendant's right to testify, (2) did not abuse its discretion in declining to give Defendant's proposed jury instruction

explaining the CDSOA, (3) committed no reversible error, in violation of Rule 30(b), when it revised the mail-fraud jury instruction to correct a misstatement of the law by defense counsel during her closing argument, and (4) did not plainly err in giving a modified *Allen* charge.

**AFFIRMED.**